ACCEPTED
14-17-01010-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
5/16/2018 4:34 PM
CHRISTOPHER PRINE
CLERK

No. 14-17-01010-CV

IN THE FOURTEENTH COURT OF APPEALS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
5/16/2018 4:34:40 PM
CHRISTOPHER A. PRINE
Clerk

SCHEAR HAMPTON DRYWALL, LLC,

*Appellant,*

V.

FOUNDERS COMMERCIAL, LTD,

*Appellee.*

On Appeal from the 61st Judicial District Court
Harris County, Texas
Cause No. 2015-22140

BRIEF OF APPELLANT

Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
**Bell Nunnally & Martin LLP**
3232 McKinney Avenue, Suite 1400
Dallas, Texas  75204-2429
Telephone:  (214) 740-1400
Telecopy:  (214) 740-1499
**COUNSEL FOR APPELLANT**

## CERTIFICATE OF PARTIES

The following is a complete list of all parties to the trial court's judgment and the names and addresses of all trial and appellate counsel.

**APPELLANT SCHEAR HAMPTON DRYWALL, LLC**

Represented at trial by:

Carl W. Thompson
The Law Office of Carl Thompson, PC
2550 Gray Falls, Suite 200
Houston, Texas 77077

Keith Coulter
Coulter, P.C.
3306 Sul Ross Street
Houston, Texas 77098

Represented in this appeal by:

Jeffrey S. Lowenstein
Bell Nunnally & Martin LLP
3232 McKinney Avenue, Suite 1400
Dallas, Texas  75204-2429

**APPELLEE FOUNDERS COMMERCIAL, LTD.**

Represented at trial and this appeal by:

J. W. Beverly
Ferguson Braswell Fraser Kubasta PC
9 Greenway Plaza, Suite 500
Houston, Texas 77046

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF PARTIES.............................................................................. ii

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT OF THE CASE..............................................................................1

ISSUES PRESENTED...........................................................................................1

STATEMENT OF FACTS ....................................................................................2

PROCEDURAL BACKGROUND........................................................................4

SUMMARY OF ARGUMENT .............................................................................5

STANDARD OF REVIEW ...................................................................................6

ARGUMENT AND AUTHORITIES....................................................................7

I.     THE FINAL JUDGMENT FAILED TO FORECLOSE THE LIEN. ............7

II.    THE EVIDENCE AND LAW DID NOT SUPPORT THE TRIAL COURT REDUCING THE LIEN TO $21,678.32.........................................9

    A.    There was legally and factually insufficient evidence that Schear Hampton was only owed $36,678.32 by CSI......................................9

    B.    Founders could not recover damages from Shear Hampton or an offset of the lien amount as a matter of law. ......................................13

        1.    Schear Hampton and Founders were not in privity. .................15

        2.    Founders was not a third-party beneficiary of the Subcontract.............................................................................16

    C.    There was legally and factually insufficient evidence supporting a $15,000 damages award and/or offset of the lien............................20

III.   THE TRIAL COURT'S DENIAL OF ATTORNEYS' FEES TO SCHEAR HAMPTON WAS CONTRARY TO LAW AND RELIED ON THE IMPROPER PARTIAL INVALIDATION OF THE LIEN. ........21

PRAYER ..................................................................................................23

CERTIFICATE OF COMPLIANCE ........................................................24

CERTIFICATE OF SERVICE ...................................................................25

INDEX TO APPENDIX .............................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B & C Constr. Co. Grain Handling Corp.*,
 521 S.W.2d 98 (Tex.Civ.App.—Amarillo 1975, no writ)..................................14

*Bass v. City of Dallas*,
 34 S.W.3d 1 (Tex.App.—Amarillo 2000, no pet.) ............................................15

*BMC Software Belg., N.V. v. Marchand*,
 83 S.W.3d 789 (Tex. 2002)................................................................................7

*Cain v. Bain*,
 709 S.W.2d 175 (Tex. 1986) (per curiam) .......................................................6

*Crawford Services, Inc. v. Skillman Intern. Firm, L.L.C.*,
 444 S.W.3d 265 (Tex. App.—Dallas 2014, pet. dism'd) ...................................8

*First Nat'l Bank in Graham v. Sledge*,
 653 S.W.2d 283 (Tex. 1983) .............................................................................8

*Fulgham v. Fischer*,
 349 S.W.3d 153 (Tex. App.—Dallas 2011, no pet.) ......................................6, 7

*Hou–Tex, Inc. v. Landmark Graphics*,
 26 S.W.3d 103 (Tex.App.—Houston [14th Dist.] 2000, no pet.) ......................15

*LAN/STV v. Martin K. Eby Const. Co., Inc.*,
 435 S.W.3d 234 (Tex. 2014) ............................................................................15

*Thomson v. Espey Huston & Associates, Inc.*,
 899 S.W.2d 415 (Tex. App.—Austin 1995, no writ) ...........................13, 14, 15

*Trans–Gulf Corp. v. Performance Aircraft Servs., Inc.*,
 82 S.W.3d 691 (Tex.App.—Eastland 2002, no pet.)........................................15

*Zieben v. Platt*,
 786 S.W.2d 797 (Tex. App.—Houston [14th Dist.] 1990, no writ)....................6

**Statutes**

TEX. PROP. CODE § 53.024 ..................................................................................9, 10, 19

TEX. PROP. CODE § 53.153 ...........................................................................................16

TEX. PROP. CODE § 53.156 ......................................................................................21, 22

TEX. PROP. CODE. § 53.160(b) ....................................................................................19

TEX. PROP. CODE ANN. § 53.158 ...................................................................................7

Texas Property Code Chapter 53 ................................................................................5, 7

**Other Authorities**

*Corbin on Contracts* § 779D, at 46-47 (1951) ...........................................................13

**TO THE HONORABLE FOURTEENTH COURT OF APPEALS:**

Appellant **SCHEAR HAMPTON DRYWALL, LLC** ("Schear Hampton"), plaintiff in the proceedings below, appeals the Final Judgment signed on October 2, 2017 (the "Judgment"), following a bench trial in Cause No. 2015-22140, in the 61st Judicial District Court of Harris County, Texas.  CR 204.[1]

## STATEMENT OF THE CASE

This case was filed by Schear Hampton to foreclose a statutory mechanic's and materialman's lien for construction work it performed on property owned by Appellee **FOUNDERS COMMERCIAL, LTD** ("Founders"). CR 5.  The case was tried to the bench.  CR 204.  The trial court signed the Judgment.  App. A; CR 206. The trial court issued Findings of Fact and Conclusions of Law.  App. B; CR 212-14. Schear Hampton appealed.  CR 221.

## ISSUES PRESENTED

1.    Did trial court err in failing to foreclose Schear Hampton's lien?

2.    Did the trial court err in reducing and/or partially invalidating Schear Hampton's Lien?

---

[1] "CR" refers to the consecutively-numbered pages in the Clerk's Record.  "RR" refers to the Reporter's Record.  The Reporter's Record consists of thirteen volumes.  Volumes 2 through 6 are transcripts of the bench trial.  Volumes 7 through 11 are Plaintiff's trial exhibits.  Volumes 12 and 13 are Defendant's trial exhibits.  Each reference to the trial transcript includes the volume number before "RR," the page number after "RR," and the lines upon which the referenced material appears after the colon.  Thus, a reference to volume two, page three, line four is "2 RR 3:4."  Each reference to a trial exhibit includes the volume number before "RR" and either "PX" (Plaintiff's Exhibit) or "DX" (Defendant's Exhibit) after "RR" followed by the exhibit number.  Thus, a reference to Plaintiff's Exhibit 2 in volume 7 is "7 RR PX 2."

3. Did the trial court err in denying Schear Hampton an award of attorneys' fees?

## STATEMENT OF FACTS

1. On January 26, 2012, Founders, as owner, entered into a contract (the Prime Contract") with Construction Supervisors, Inc. ("CSI"), as general contractor, for the construction of a facility in Houston, Harris County, Texas known as The Abbey at Westminster Plaza (the "Abbey"). CR 209.

2. On or about January 10, 2014, CSI entered into a subcontract (the "Subcontract") with Schear Hampton to perform certain work, including the application of stucco, which was part of CSI's obligation to Founders pursuant to the Prime Contract. App. C; CR 209.

3. The stucco work was initially to be performed by Target Masonry ("Target"), but Target abandoned the project after it had completed less than half of the work. Schear Hampton was hired to finish Target's scope of work. 3 RR 106:12-107:15.

4. The original Subcontract contemplated a turnkey solution from Schear Hampton for a defined scope of work for a total of $235,000. App. C; 2 RR 67. As work proceeded, it became apparent that CSI and/or Founders needed to broaden the scope of Schear Hampton's work due to CSI's failure to provide essential equipment for Schear Hampton's work and as a result of Target's shortcomings in its services. 7 RR PX 4-19; 2 RR 94:24-95:13, 96:4-7. Schear Hampton issued change orders and

work orders/field change orders for these added services. The approved additional equipment and services totaled $155,967, bringing the total contract value to $390,967.00. 7 RR PX 4-19; 2 RR 115:2-5; 11 RR PX 74.9.

5.      The main Subcontract document was a standard form. App. C; 3 RR 113:22-25; 7 RR PX 2. The Subcontract was customized for the Schear Hampton/CSI relationship through the addition of an "Additions to Contract" addendum which was signed by CSI and Schear Hampton. The "Additions to Contract" provided, in pertinent part, that:

> "4. W.O. [write offs], extras, back charges, etc., only by G.C. [CSI] & subcontractor [Schear Hampton] signed change order. . .
>
> 10. No 3rd party contingencies or contracts.
>
> 11. This is a complete contract. Those things typed or hand written provisions shall control and be prevailing on all parties if in conflict of this contract."

App. C (last page); 3 RR 120:24-121:12.

6.      Schear Hampton completed all work under the Subcontract, including "punch list" items outlined by CSI.[2]  CSI failed to pay the complete amounts due under the Subcontract. The balance owed to Schear Hampton by CSI for work on the Abbey performed by SHD is $152,173.60. 11 RR PX 74.9.

---

[2] The trial court found that Shear Hampton failed to perform some of its work in accordance with its obligations pursuant to the Subcontract and failed to complete certain punch list items in accordance with the provisions of the Subcontract. CR 209-210. The trial court's finding was not supported by the evidence as demonstrated *infra*.

7.      Schear Hampton, however, had no contract with Founders (App. C) and there was no evidence of a change order authorizing back charges or write offs for any alleged damage caused by Schear Hampton to the Abbey, which was required by the addendum to the Subcontract. *Id.*

8.      On or about January 30, 2015, Schear Hampton filed an Amended Affidavit for Mechanic's and Materialman's Lien (the "Lien") among the real property records of Harris County, Texas, claiming a lien against the Abbey in the amount of $152,173.60. CR 210.

## PROCEDURAL BACKGROUND

Schear Hampton filed Plaintiff's Original Petition on April 16, 2015. CR 2. Founders answered and filed counterclaims on May 20, 2015. CR 9, 11. Founders filed a third party petition against CSI on January 7, 2016. CR 17. A no-answer default judgment was entered against CSI on March 14, 2016. CR 36. The claims between Schear Hampton and Founders were presented at a bench trial from August 14 to 22, 2017. *See* RR volumes 2 through 6. Schear Hampton requested Findings of Fact and Conclusions of Law on October 12, 2017. CR 207. The trial court signed the Judgment on October 2, 2017 (CR 204) and Findings of Fact and Conclusion of Law on October 26, 2017. CR 212. Schear Hampton filed its notice of appeal on December 27, 2017. CR 221.

## SUMMARY OF ARGUMENT

The Judgment incorrectly addressed the claims in the case as if it involved cross-claims between two parties to a construction contract. There was no contract between Schear Hampton and Founders. The sole proper claim between them was Schear Hampton's claim for foreclosure of its statutory lien. Chapter 53 of the Texas Property Code dictates the available remedies under that statute: (1) foreclosure of the lien, (2) calculation of the amount owed to the subcontractor, (3) calculation of the amount recoverable against the owner, and (4) an award of equitable and just attorneys' fees.

The Judgment failed on all counts. It did not foreclose the lien. It miscalculated the amount owed to Schear Hampton. It failed to address the amount recoverable under the lien. And it failed to award equitable and just attorneys' fees. Further, the Judgment improperly awarded damages to Founders and partially voided the lien based on those damages based on contract/negligence claims against Schear Hampton by Founders, which were unavailable to Founders as a matter of law.

Schear Hampton is entitled to judgment rendered in its favor foreclosing the Lien at its full value of $152,173.60. Schear Hampton is also entitled to a renderd judgment that Founders take nothing by its counterclaim. Remand is required to

allow the trial court to properly consider the just and equitable attorneys' fees to which Schear Hampton is entitled.

## STANDARD OF REVIEW

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict and are reviewed under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). When the appellate record contains a reporter's record as it does in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *Id.* All evidence is examined and the finding is set aside only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex. App.—Houston [14th Dist.] 1990, no writ); *see also Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

When an appellant challenges the legal sufficiency of an adverse finding, it must demonstrate there is no evidence to support the adverse finding. *Id.* When reviewing the record, the court of appeals determines whether any evidence supports the challenged finding. *Id.* If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Id.*

Conclusions of law are reviewed de novo. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). This Court is not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Fulgham*, 349 S.W.3d at 157-58.

## ARGUMENT AND AUTHORITIES

## I. THE FINAL JUDGMENT FAILED TO FORECLOSE THE LIEN.

There was no privity of contract between Schear Hampton and Founders. CR 10. Schear Hampton's remedy against Founders for the unpaid amounts on the Subcontract with CSI, was a suit to foreclose its statutory lien. Founders sole basis for its claims back against Schear Hampton were claims for breach and negligence. CR 11-13. As discussed in more detail *infra*, Founders is not entitled to recover under either theory as a matter of law. Founders remedies were limited to its claims against CSI. Founders appropriately sued and obtained a default judgment against CSI for the alleged construction related deficiencies. CR 25-38.

The issues properly before the trial court were the limited procedures and remedies available under Chapter 53 of the Texas Property Code.

To enforce a mechanic's lien, the lienholder must file a lawsuit and obtain a judgment from a court of competent jurisdiction foreclosing its statutory lien. TEX. PROP. CODE ANN. § 53.158. To prevail on its claim, the lienholder must prove it

performed the labor or furnished the materials and the debt is valid. *Crawford Services, Inc. v. Skillman Intern. Firm, L.L.C.*, 444 S.W.3d 265, 268 (Tex. App.—Dallas 2014, pet. dism'd). In addition, the statutory lienholder must establish it substantially complied with the statutory requirements for perfecting a lien. *Id.*, *citing First Nat'l Bank in Graham v. Sledge,* 653 S.W.2d 283, 285–86 (Tex.1983) (statutory lienholder's rights "totally dependent on compliance with the statutes authorizing the lien"). Pursuant to the statutory scheme, the trial court determines whether the debt is valid and the lien is perfected. *Crawford*, 444 S.W.3d at 268 (recognizing that issues in foreclosure suit are whether debt and lien are valid).

Once the trial court determines that the lienholder has a valid debt and a perfected mechanic's lien, it does not have discretion under Section 53.154 to deny a judgment of foreclosure and order of sale of the property subject to the lien. *Crawford*, 444 S.W.3d at 271.

Here the trial court found that the lien was valid and enforceable, but the Judgment was incorrect as a matter of law because it failed to foreclose the lien. The Judgment also incorrectly calculated the amount of the lien and assessed damages in Founders' favor. Those issues are addressed below. This Court should render judgment foreclosing the lien.

## II. THE EVIDENCE AND LAW DID NOT SUPPORT THE TRIAL COURT REDUCING THE LIEN TO $21,678.32.

### A. There was legally and factually insufficient evidence that Schear Hampton was only owed $36,678.32 by CSI.

The amount of a lien claimed by a subcontractor may not exceed:

(1) an amount equal to the proportion of the total subcontract price that the sum of the labor performed, materials furnished, materials specially fabricated, reasonable overhead costs incurred, and proportionate profit margin bears to the total subcontract price; minus

(2) the sum of previous payments received by the claimant on the subcontract.

TEX. PROP. CODE §53.024.

The original amount owed under the Subcontract was $235,000. App. C, sec. 10. CSI requested and authorized a series of change orders and work tickets for work beyond Schear Hampton's original scope of work. 7 RR PX 4-19. After applying the change orders and work tickets, the total amount owed under the Subcontract was $390,967.00. 11 RR PX 74.9. And Schear Hampton presented evidence that it earned 100% of the contract price. *Id.*; 3 RR 42:5-48:24, 50:17-25; 70:12-19, 152:2-23; 10 RR PX 68.

The payments received by Schear Hampton totaled $238,793.40. 11 RR PX 74.9. The payments to Schear Hampton were corroborated by substantial evidence. Schear Hampton's financial records showed all the payments it received from CSI and established that the last payment it received was in August 2014. 8 RR PX 21

(first 4 entries under "Sales"). John Black, CSI's president, confirmed CSI stopped making payments to Schear Hampton in September 2014. 3 RR 142:6-15. Schear Hampton's financials showed that the total of the payments received by Schear Hampton was $241,436.40. 8 RR PX 21

In November 2014, after the date CSI admits it had made its final payment to Schear Hampton, Schear Hampton submitted a pay application to CSI showing it had been paid a total of $238,793.40 as of November 2014 and that it was owed a net of $152,173.60. 11 RR PX 74.9. There was no evidence or testimony that Schear Hampton's November 2014 Pay Application was inaccurate. And, because there were no additional payments made to Schear Hampton, Plaintiff's Exhibit 74.9 reflects the proper amount of the debt on the lien.

Nonetheless, the trial court found that "The Balance owed to [Shear Hampton] by CSI for work on the The Abby performed by [Schear Hampton] is $36,678.32." CR 212 (¶3). The trial court failed to calculate the amount of the lien in accordance with the lien statute. TEX. PROP. CODE §53.024. Specifically, the trial court did not make a finding as to the amount of the Subcontract, how much of the Subcontract was earned, or the total of payments to Schear Hampton. The trial court made no finding as to how it calculated $36,678.32 as the amount owed.

The only information in the record where the trial court could have found the amount it did award was in Defendant's Exhibit 41 which showed payments to

Schear Hampton totaling $330,104.92 by April 15, 2015, resulting in a net owed to Schear Hampton of $36,678.32. 13 RR DX 41. This was $92,000 more than Schear Hampton was paid. There is simply no evidence of when, how, or by whom there was an additional nearly $92,000 paid to Schear Hampton by CSI after November 2014 when Schear Hampton sent its last pay application (11 RR PX 74.9), CSI admitted it made no payments to Schear Hampton after September 2014. 3 RR 142:6-15. And there was no evidence that Founders made any payments to Schear Hampton.

Exhibit 41 is dated after Schear Hampton filed its lien and sent written demand and was clearly created for the litigation by Founders. CR 19. Notably, Founder's third party petition against CSI, confirms the impossibility of Exhibit 41's accuracy.

> The following month, on December 15, 2014, Schear Hampton provided notice of debt and an affidavit lien to CSI, The Abbey, and Founders, claiming an unpaid balance of $152,173.60. On January 16, 2015, Schear Hampton filed an Affidavit for Mechanic's and Materialman's Lien at Harris County Real Property Record No. 20150020430 claiming $152,173.60. And finally, on March 26, 2015, Schear Hampton sent a written demand for payment of this claimed debt to Founders and to CSI.

CR 19. These judicial admissions were filed 8 months after Schear Hampton filed the lawsuit. Founders makes no reference to the alleged inaccuracy of the lien amount or the inaccuracy of the unpaid balance. Further, even in its First Amended Counterclaim against Schear Hampton, when requesting a reduction of the lien, Founders makes no mention that there was a miscalculation of the amount claimed

in the lien. CR 50-54. There is also no testimony that Schear Hampton was paid anything after August 2014.

Defendant's Exhibit 41 was presented through John Black, the President[3] of CSI. There was no foundation laid for the document or Mr. Black's personal knowledge of the information in the document. There was also no evidence of who prepared the document, the accuracy of any of the information in the document, or any other indicia to credit the document as accurate. There was certainly no evidence that Defendant's Exhibit 41 was prepared or submitted by Schear Hampton. 2 RR 108:18-109:7; 11 RR PX 74.1-74.9. Notably, Defendant's Exhibit 41 does not have an electronic signature of Schear Hampton's owner, Jim Smith, which all other pay applications submitted by Schear Hampton did have. Also, the details on the second page of Defendant's Exhibit 41 do not match the details on any other pay application that Schear Hampton did prepare. *Id.*

Therefore, there is no evidence that Schear Hampton was paid $330,104.92. Alternatively, the great weight of evidence does not support the trial court's Finding of Fact that Schear Hampton was only owed $36,678.32. Further, the trial court's conclusion of law that the lien was partially invalid as a result of that finding was not supported by the evidence.

---

[3] John Black is identified as the President of CSI on the Subcontract. 7 RR PX 3

**B.** **Founders could not recover damages from Shear Hampton or an offset of the lien amount as a matter of law.**

In the construction context, a property owner is ordinarily not a third-party beneficiary of a contract between the general contractor and a subcontractor. *Thomson v. Espey Huston & Associates, Inc.*, 899 S.W.2d 415, 419–20 (Tex. App.— Austin 1995, no writ). The relationships between property owners, general contractors, and subcontractors are well established under generally prevailing contract principles. *Id.* A leading treatise on contract law explains:

> Such contracts [between a principal building contractor and subcontractors] are made to enable the principal contractor to perform; and their performance by the subcontractor does not in itself discharge the principal contractor's duty to the owner with whom he has contracted. The installation of plumbing fixtures or the construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner to deliver a finished building containing those items; and if after their installation the undelivered building is destroyed by fire, the principal contractor must replace them for the owner, even though he must pay the subcontractor in full and has no right that the latter shall replace them. It seems, therefore, that the owner has no right against the subcontractor, in the absence of clear words to the contrary. The owner is neither a creditor beneficiary nor a donee beneficiary; the benefit that he receives from performance must be regarded as merely incidental.

*See id.*, citing Arthur L. Corbin, *Corbin on Contracts* § 779D, at 46–47 (1951).

This general rule is grounded in the respective interests of the property owner, general contractor, and subcontractors. The contract between the property owner and the general contractor gives the property owner the right to a finished building. Subsequent contracts between the general contractor and subcontractors add nothing

to this entitlement; the owner is still entitled to the same building, regardless of the means by which it is constructed. These same subcontracts, however, are vital to the interests of the general contractor, who has assumed the obligation to deliver a finished building. In most cases, subcontracts will be necessary to enable the general contractor to deliver the building and avoid liability for breach of contract. This need, rather than the interests of the property owner who is entitled to a finished building both before and after the subcontract, is the primary motivation for subcontracting. *Thomson*, 899 S.W.2d at 419.

For their part, subcontractors are selected by the general contractor. Usually, it is the general contractor who assigns them tasks, negotiates and signs their contracts, monitors their performance, and pays them on completion. If the subcontractors' performance falls short of what the owner is entitled to, it is the general contractor who has to make up the difference. From the subcontractors' perspective, as well as the general contractor's, subcontracts are intended primarily to benefit those parties rather than the property owner. Therefore, absent clear evidence to the contrary, a property owner is not a third-party beneficiary of a contract between the general contractor and a subcontractor. *See id.* at 420, citing *B & C Constr. Co. v. Grain Handling Corp.,* 521 S.W.2d 98, 101 (Tex.Civ.App.—Amarillo 1975, no writ).

The economic loss rule has been applied to deny recovery of purely economic losses in actions for negligent performance of services. *LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234 (Tex. 2014). That is, a plaintiff cannot maintain a tort cause of action against a defendant when its damages are only for economic losses caused by the failure to perform a contract. *Bass v. City of Dallas,* 34 S.W.3d 1, 8 (Tex.App.-Amarillo 2000, no pet.). So, "if a contractual duty is negligently performed, causing only economic loss, only a breach of contract action may be maintained, and an action in tort for negligence is precluded." *Id.* "Economic loss" has been defined as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property. . .' " *Id.* at 9 (quoting *Thomson,* 899 S.W.2d at 421). The economic loss rule not only applies to bar claims against those in a direct contractual relationship but also applies to preclude tort claims between parties who are not in privity. *See id.* at 8–9; *Trans–Gulf Corp. v. Performance Aircraft Servs., Inc.,* 82 S.W.3d 691, 695 (Tex.App.—Eastland 2002, no pet.); *Hou–Tex, Inc. v. Landmark Graphics,* 26 S.W.3d 103, 106–07 (Tex.App.—Houston [14th Dist.] 2000, no pet.).

### 1. Schear Hampton and Founders were not in privity.

It is undisputed here that there was no contract between Schear Hampton and Founders, the owner. CR 50. Because there is no contractual privity between Schear

Hampton and Founders as outlined in the discussion above, the sole remedies between them are limited to the lien statute.[4]  Founders' defenses under that statute are limited to pursuing CSI (the general/original contractor) to make Founders whole.  TEX. PROP. CODE. § 53.153.  The statute does not permit Founders to claim damages against Schear Hampton.  Founders appropriately pursued this remedy in filing a third party petition against CSI.  And, Founders obtained a default judgment against CSI.  CR 25-38.

### 2. Founders was not a third-party beneficiary of the Subcontract.

The trial court found that:

4. [Shear Hampton] failed to perform some of its work in accordance with its obligations pursuant to the Subcontract and failed to complete certain punchlist items in accordance with the provisions of the Subcontract.

5. [Shear Hampton] failed to exercise ordinary care in the performance of some of its obligations pursuant to the Subcontract, which caused damages to the Abbey.

6. Founders incurred damages in the amount of $15,000.00 as a result of the conduct by [Shear Hampton] SHD set forth in Paragraphs 4 and 5 above.

CR 212-13.

---

[4] The trial court found that Founders damages were a result of Schear Hampton's failure to perform under the Subcontract (CR 209-210) and Schear Hampton failed to exercise ordinary care in the performance of its obligations under the Subcontract.  CR 210.  These findings fall squarely within the economic loss rule because they all relate back to Schear Hampton's performance under the Subcontract.

The only agreement signed by Schear Hampton was the Subcontract with CSI. Nothing in the Subcontract identifies Founders as a third party beneficiary and the Addendum to the Subcontract expressly prohibits any claim by a non-party to the agreement. Specifically, the Addendum states that:

> "4. W.O. [write offs], extras, back charges, etc., only by G.C. [CSI] & subcontractor [Schear Hampton] signed change order. . .
>
> 10. No 3rd party contingencies or contracts.
>
> 11. This is a complete contract. Those things typed or hand written provisions shall control and be prevailing on all parties if in conflict of this contract."

App. C.

The sole claims pled by Founders against Schear Hampton to support the $15,000 award of damages against Schear Hampton was Negligence and Breach of Contract. CR 51-52. The trial court awarded $15,000 in damages based on its findings that Schear Hampton "failed to perform some of its work in accordance with its obligation pursuant to the Subcontract" and "Schear Hampton failed to exercise ordinary care in the performance of some of its obligations pursuant to the Subcontract." CR 212-13.

Founders had no standing to assert and was not entitled to bring a damages claim against Schear Hampton for the alleged damages caused by Schear Hampton to the Abbey. Founders was a stranger to the Subcontract. Further, nothing in the Subcontract states that Founders is a third party beneficiary to the Subcontract. And

the Addendum to the Contract limits the circumstances of when Schear Hampton will be responsible for a back charge or write off to circumstances when there is a signed change order authorizing such back charge or write off. Additionally the Addendum states that there are no "3rd party contingencies or contracts," which is an express rejection of 3rd party beneficiary status to anyone.

In its counterclaim, Founders cited to paragraphs 3.1, 10, 23, 32, and 35 of the subcontract and claimed these provisions "expressly identified [Founders] as a third-party beneficiary." CR 52. With the exception of paragraph 32 relating to warranty, each of the cited provisions expressly identify duties Schear Hampton owed exclusively to CSI – 3.1 ("Subcontractor Work" - makes no reference to Founders), 10 ("Subcontract Sum and Payment" – identifies remedies available to Contractor (CSI) in the event Schear Hampton's work is defective or causes damages to other work, but does not give any rights to Founders), 23 ("Clean-up" – requires Schear Hampton to pay CSI if it does not clean up its work and CSI has to incur the cost of clean-up, but does not create any obligation to Founders), 35 ("Default; Termination; Termination for Convenience" – identifies the conditions under which CSI could terminate the Subcontract).

The warranty provision (paragraph 32) is the sole provision in the Subcontract where Schear Hampton purports to obligate itself directly to Founders. First, the warranty provision is not enforceable by Founders because such enforcement

conflicts with the limitations to 3rd party rights in the Addendum, which expressly trumps in the event of a conflict. Second, even if the warranty did apply, there was no evidence Founders or CSI made a warranty claim or that Schear Hampton was given the opportunity to perform the warrantable work. Further, even if the warranty was breached, the sole remedy is reduction in the amounts owed Schear Hampton by the actual cost of the warranty service funded by CSI. There is no evidence of CSI's out of pocket costs, if any.

Finally, regardless of the legal basis for an award of damages to Founders, there was no basis in law to reduce the lien by the amount of the damages. Section 53.024 of the Texas Property Code sets forth how the amount of a lien of a subcontractor is to be calculated. There is no deduction in that provision for alleged damages caused by the subcontractor to the project. Further, the Court's conclusion that the lien was partially invalid because of the deductions is not supported by the statute or any other law. The validity of the lien is dictated by the lienholder's strict adherence to the procedural requirements of the statute. TEX. PROP. CODE. § 53.160(b) (detailing the grounds for objecting to the validity of a lien). None of those issues were raised here. A counterclaim for damages or offset is not a statutory basis for invalidating a lien. Therefore, the trial court's conclusion of law that the lien was partially invalid was erroneous as a matter of law.

**C.    There was legally and factually insufficient evidence supporting a $15,000 damages award and/or offset of the lien.**

Even if there were legal grounds to award Founders damages or an offset against Schear Hampton, there is no evidence to support the award of $15,000.

CSI's assistant superintendent (Randy L. Horst, Jr.) on the Abbey Project and CSI's president (John Black) testified that Schear Hampton completed its scope of work and all punch list items that were identified for Schear Hampton. 3 RR 42:5-48:24, 50:17-25; 70:12-19, 152:2-23; 10 RR PX 68.

Horst, as assistant superintendent on the Abbey Project, was responsible for daily reports, daily communications with all the subcontractors, making sure they follow through with all the given tasks, scheduling and performance and making sure they were up to par, including Schear Hampton. 3 RR 43:5-20. Horst created and oversaw completion of the punch list items identified in Plaintiff's Exhibit 68. 3 RR 43:21-44:4; 10 RR PX 68. Therefore, CSI, the general contractor, the sole party with a contractual relationship with Schear Hampton, admitted that Schear Hampton completed its scope of work under the Subcontract to the satisfaction of CSI, including the punch list items. If CSI admits that Schear Hampton fully performed, it defies logic that Founders, as an alleged third-party beneficiary, could claim Schear Hampton did not finish.

Further, there is no evidence that Schear Hampton caused any of the damages claimed. Founders presented Dave Sherman (an offsite construction consultant that

represented Founders). Sherman claimed that there was a variety of issues with stucco related work but there was no evidence of a causal link between the items Sherman noted and Schear Hampton's work. Sherman confirmed his testimony was speculative and that he relied on contractors to oversee the work of subcontractors. 5 RR 38:10-18; 4 RR 145-46; 150:3-8. Sherman also admitted that some of the defective work that he believed to be within Schear Hampton's scope was actually the work of Schear Hampton's predecessor Target Masonry and that damages associated with that work were part of the $70,000 he claimed Schear Hampton owed Founders. 5 RR 48:15 – 49:4, 58:4-25.

Further there was no evidence of a change order authorizing a back charge against Schear Hampton for $15,000, which is a requirement of the Subcontract. 7 RR PX 3. Therefore, Founders' claim for the damages/back charge is prohibited as a matter of law by the Subcontract.

## III. THE TRIAL COURT'S DENIAL OF ATTORNEYS' FEES TO SCHEAR HAMPTON WAS CONTRARY TO LAW AND RELIED ON THE IMPROPER PARTIAL INVALIDATION OF THE LIEN.

In any proceeding to foreclose, "the court shall award costs and reasonable attorney's fees as are equitable and just." TEX. PROP. CODE § 53.156. Although the trial court found that CSI owed Schear Hampton more than $36,000 pursuant to the Subcontract, the trial court found that "[n]either [Schear Hampton] nor Founders is entitled, pursuant to the provisions of either the Texas Property Code or the Texas

Declaratory Judgments Act, to a recovery of attorney's fees." CR 214.[5] While the declaratory judgments act states that fees "may" be awarded, the lien statute says that the trial court "shall" award fees as are equitable and just. TEX. PROP. CODE § 53.156. The trial court did not state why it found that Schear Hampton was not "entitled" to fees under the Property Code. If that was intended as a statement of the law, then it was incorrect as a matter of law. Alternatively, if the trial court's intention was a discretionary finding that awarding any fees to Schear Hampton would not be equitable and just, then the fees award should be remanded for reconsideration after the Court corrects the errors outlined above.

---

[5] It's unclear how the trial court worked the Declaratory Judgments Act into its findings and judgment, but that act is inapplicable to the calculation of a statutory lien.

## PRAYER

**WHEREFORE**, Appellant Schear Hampton Drywall, LLC is entitled to judgment rendered in its favor foreclosing the Lien at its full value of $152,173.60. Schear Hampton is also entitled to a judgment rendered that Founders take nothing by its counterclaim.  Alternatively, the calculation of the amount of the lien should be remanded for the trial court to consider the proper calculation of the lien under the lien statute.  Remand is also required to allow the trial court to properly consider the just and equitable attorneys' fees to which Schear Hampton Drywall, LLC is entitled.

Respectfully submitted,

By: */s/Jeffrey S. Lowenstein*
     Jeffrey S. Lowenstein
     Texas Bar No. 24007574
     jlowenstein@bellnunnally.com

**Bell Nunnally & Martin LLP**
3232 McKinney Avenue, Suite 1400
Dallas, Texas  75204-2429
Telephone:  (214) 740-1400
Telecopy:  (214) 740-1499

**COUNSEL FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this document was produced on a computer using Microsoft Word 2016. The document contains 4,307 words according to the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Jeffrey S. Lowenstein*
Jeffrey S. Lowenstein

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was delivered to the following persons on May 16, 2018, through the EFILE.TXCOURTS.GOV electronic filing system:

**VIA EFILE.TXCOURTS.GOV**
J. W. Beverly
Ferguson Braswell Fraser Kubasta PC
9 Greenway Plaza, Suite 500
Houston, Texas 77046

*/s/ Jeffrey S. Lowenstein*
Jeffrey S. Lowenstein

3903520_1.docx / 11297.1

# INDEX TO APPENDIX

A.      Final Judgment [CR 204]

B.      Findings of Fact and Conclusions of Law [CR 212]

C.      Construction Supervisors, Inc. Subcontract [7 RR PX 3]

D.      TEXAS PROPERTY CODE SECTION 53.024, 53.153, 53.156, 53.158, AND 53.160(b)

9/12/2017 3:39:23 PM
**Chris Daniel - District Clerk**
**Harris County**
**Envelope No: 19384343**
**By: KIRBY, TERESA A**
**Filed: 9/12/2017 3:39:23 PM**

Pgs-3

8BP
8A
CRLPZ
SALPZ

CAUSE NO. 2015-22140

| | | |
|---|---|---|
| SCHEAR HAMPTON DRYWALL, LLC, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| FOUNDERS COMMERCIAL, LTD., | § | |
| Defendant. | § | 61ST JUDICIAL DISTRICT |

## FINAL JUDGMENT

On August 14, 2017, this case was called for trial. Plaintiff, Schear Hampton Drywall, LLC, appeared and announced ready for trial. Defendant and Counterclaimant, Founders Commercial, Ltd., also appeared and announced ready for trial. Third-Party Defendant Construction Supervisors, Inc., an interlocutory default judgment having been previously entered against it, failed to appear for trial.

All matters in controversy, legal and factual, were submitted to the Court for its determination, no jury having been requested. After hearing the evidence and arguments of counsel, and considering applicable legal principles, the Court is of the opinion that ~~the following judgment should be entered, and it is therefore ORDERED, ADJUDGED and DECREED as follows:~~ Plaintiff's lien is partially valid in the amount of $36,678.32. The Court further finds that Defendant is entitled to recover $15,000 in damages on its counterclaim against Plaintiff. Based on same, the Court is of the opinion that the following judgment should be entered, and it is therefore ORDERED, ADJUDGED and DECREED that:

1.      Plaintiff Schear Hampton Drywall, LLC recover judgment against Defendant Founders Commercial, Ltd. in the amount of $21,678.32.

2.      Defendant Founders Commercial, Ltd. recover a default judgment against third-party Defendant Construction Supervisors, Inc. in the amount of $21,678.32.

3.      Pursuant to the Texas Uniform Declaratory Judgments Act, the Court declares that the lien filed of record by Plaintiff Schear Hampton Drywall, LLC against the property known as The Abbey at Westminster Plaza, located at 2855 Westminster Plaza Dr., Houston, Texas 77082,

204

is partially null and void and of no force and effect, to the extent it exceeds the amount of $21,678.32. This declaration of partial invalidity specifically includes the Affidavit for Mechanic's and Materialman's Lien filed by Plaintiff Schear Hampton Drywall, LLC on or about January 16, 2015, with the Harris County Clerk's file number 20150020430, and the Amended Affidavit for Mechanic's and Materialman's Lien filed by Plaintiff Schear Hampton Drywall, LLC on or about January 30, 2015, with the Harris County Clerk's file number 20150041298 (the "Liens").

4.      If the judgment awarded to Schear Hampton Drywall, LLC is not paid when final, then Schear Hampton Drywall, LLC may conduct a foreclosure sale in compliance with the provisions of the Texas Property Code, with respect to the real property identified in the Liens.

5.      Plaintiff Schear Hampton Drywall, LLC is further awarded pre-judgment interest on the amount of $21,678.32 at 5% interest per annum from May 20, 2015 until paid.

6.      ~~Defendant Founders Commercial, Ltd. is awarded judgment against Schear Hampton Drywall, LLC for its reasonable and necessary attorneys' fees incurred in the amount of $____ herein.~~

7.      ~~If Plaintiff Schear Hampton Drywall, LLC unsuccessfully appeals this judgment to the court of appeals, Defendant Founders Commercial, Ltd. will recover additional reasonable and necessary attorneys' fees in the amount of $30,000.00 from Plaintiff Schear Hampton Drywall, LLC.~~

8.      ~~If Plaintiff Schear Hampton Drywall, LLC petitions for review with the Texas Supreme Court and the Texas Supreme Court denies review resulting in an affirmance of the judgment, or the judgment is affirmed, or the judgment is affirmed with an order of remittitur,~~

2

205

~~Defendant Founders Commercial, Ltd. shall recover additional reasonable and necessary attorneys' fees in the amount of $12,500.00 from Plaintiff Schear Hampton Drywall, LLC.~~

~~9. If the Texas Supreme Court grants review and the judgment is affirmed, or the judgment is affirmed with an order of remittitur, or the Texas Supreme Court asks for briefing on the merits before granting review and then denies review resulting in an affirmance of the judgment, Defendant Founders Commercial, Ltd. shall recover additional reasonable and necessary attorneys' fees in the amount of $20,000.00 from Plaintiff Schear Hampton Drywall, LLC.~~

~~10. If the Texas Supreme Court grants review and orders oral argument, and the judgment is affirmed, or the judgment is affirmed with an order of remitter, Defendant Founders Commercial, Ltd. shall recover additional reasonable and necessary attorneys' fees in the amount of $5,000.00 from Plaintiff Schear Hampton Drywall, LLC.~~

~~11. All of the above amounts in favor of Defendant Founders Commercial, Ltd. shall accrue post-judgment interest at the rate of 5% per annum, compounded annually, from the date of this judgment until paid in full.~~

12. Each party shall bear its own fees and costs of court incurred herein.

13. This judgment disposes of all claims asserted by the parties in this case.

DATED this _____ day of _____, 2017 in Houston, Texas.

Signed:
10/2/2017

_____
JUDGE PRESIDING

3

CAUSE NO. 2015-22140

| | | |
|---|---|---|
| SCHEAR HAMPTON DRYWALL, LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| FOUNDERS COMMERCIAL, LTD. | § | 61st JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the Court by agreement of all parties. The Court makes the following findings of fact and conclusions of law with respect to the claims asserted by the various parties herein.

### FINDINGS OF FACT

1.  On January 26, 2012, Founders Commercial, Ltd. ("Founders"), as owner, entered into a contract (the "Prime Contract") with Construction Supervisors, Inc. ("CSI"), as general contractor, for the construction of a facility in Houston, Harris County, Texas known as The Abbey at Westminster Plaza (the "Abbey").

2.  On or about January 10, 2014, CSI entered into a subcontract (the "Subcontract") with Schear Hampton Drywall, LLC ("SHD") to perform certain work, including the application of stucco, which was part of CSI's obligation to Founders pursuant to the Prime Contract.

3.  The balance owed to SHD by CSI for work on The Abbey performed by SHD is $36,678.32.

4.  SHD failed to perform some of its work in accordance with its obligations pursuant to the Subcontract and failed to complete certain punchlist items in accordance with the provisions of the Subcontract.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

212

5. SHD failed to exercise ordinary care in the performance of some of its obligations pursuant to the Subcontract, which caused damages to the Abbey.

6. Founders incurred damages in the amount of $15,000.00 as a result of the conduct by SHD set forth in Paragraphs 4 and 5 above.

7. On or about January 30, 2015, SHD filed an Amended Affidavit for Mechanic's and Materialman's Lien (the "Lien") among the real property records of Harris County, Texas, claiming a lien against the Abbey in the amount of $152,173.60.

8. SHD failed to prove that it was due the sum of $152,173.60 for work performed at the Abbey. The evidence established that SHD was due the net sum of $21,678.32 for work performed at the Abbey.

9. SHD's Lien claim is invalid to the extent it exceeds the sum of $21,678.32.

10. It would be neither equitable nor just for either Founders or SHD to recover attorney's fees against the other party.

## CONCLUSIONS OF LAW

11. The Subcontract constitutes a valid and binding contract between SHD and CSI, in accordance with the written terms thereof.

12. The Lien against the Abbey is partially null and void and of no force and effect, to the extent it exceeds the amount of $21,678.32.

13. After applying an offset in favor of Founders in the amount of $15,000, SHD is entitled to a net recovery in the amount of $21,678.32, and a mechanic's lien in such amount only.

14. In the event Founders does not pay SHD the principal amount due on the Judgment when it becomes final, SHD may foreclose the Lien in accordance with applicable provisions of the Texas Property Code.

2

15. Neither SHD nor Founders is entitled, pursuant to the provisions of either the Texas Property Code or the Texas Declaratory Judgments Act, to a recovery of attorney's fees.

16. SHD is not entitled to recovery on its claim for quantum meruit.

17. CSI was duly served with Founders' third-party action against CSI, but defaulted and failed to appear or answer, leading to the entry of an interlocutory default judgment.

18. By defaulting, CSI admitted all of the factual allegations set forth in such third-party action.

19. Pursuant to the Prime Contract and applicable provision of the Texas Property Code, CSI is responsible for indemnifying Founders for the net amount of $21,678.32 awarded to SHD.

DATED the 26 day of October, 2017.

_____
JUDGE FREDERICKA PHILLIPS

 COMPLETED

## CONSTRUCTION SUPERVISORS, INC. SUBCONTRACT

**Section 1**                                          JOB: 4237          CODE: 4 0 7

This Subcontract is made and entered into by and between the Contractor and Subcontractor listed below on the date set forth below.

The parties agree as follows:

Contractor has entered into a contract (the "Contract") dated **January 26, 2012** with Owner to perform certain labor and furnish certain materials for the erection, construction and completion of the Project in accordance with the plans, specifications, addenda, all applicable safety rules and regulations and any general, special and supplementary conditions of the Contract, all of which are made part of said Contract and all of which are now made part of this Subcontract, said Contract, plans, specifications, addenda and other documents set forth above being hereinafter referred to as the "Contract Documents".

CONTRACTOR: **Construction Supervisors, Inc.**          SUBCONTRACTOR: _____ **SCHEAR HAMPTON DRYWALL, INC.** _____

ADDRESS: 11111 Katy Frwy., #120, Houston, TX 77079   ADDRESS: 925 S. Mason Rd., #101,   Katy, Texas 77450-3874

TELEPHONE: (713) 667-0123  Fax (713) 667-3064          TELEPHONE: _____ **(832) 449-3744** _____   (fax: (832) 449-3734)

DATE: January 10, 2014   DESCRIPTION: The Abbey at Westminster Plaza, Phase II, Houston, Texas

OWNER: Founders Commercial, Ltd., dba The Abbey at Westminster Plaza, 6101 S. Broadway Ave, Tyler, TX 75703 JOB NUMBER: 4237

JOB ADDRESS: 2855 Westminster Plaza, Houston, Texas 77082

PLANS & SPECIFICATIONS ENTITLED: The Abbey at Westminster Plaza, Phase II, Houston, Texas

PREPARED BY: Ted Trout Architect & Associates, Ltd.                         DATED: See Item Number 3.11

**Section 2.** Items # A, B, C, D, & E from **Section 33** apply to this Subcontract, but the other item from **Section 33(f)** does not apply.

**Section 3.1**  Subcontract Work: Subcontractor agrees to furnish all necessary skilled labor, materials, equipment, supervision, services, supplies, and insurance for **STUCCO, LABOR & MATERIAL**, in strict accordance with the Contract Documents and subject to the entire satisfaction and approval of the Owner, Lender, Architect, Engineer and Contractor or their authorized representatives (the "Subcontract Work") for the amount shown in Section 10 hereof. Subcontractor shall, for no additional compensation, furnish all necessary and attendant accessories incidentally required for a complete installation of the Subcontract Work.

**3.2.   The Subcontract Work specifically includes, but is not limited to:**

a.  Furnish all labor, tools, materials, services and equipment, etc., required to fulfill this Subcontract in its entirety, per the plans and specifications and other Contract Documents.

b.  Clean up and removal to onsite dumpster provided by General Contractor of all debris caused by work covered under this Subcontract.

c.  Compliance with Section 1A.08 (Shop drawings and submittals) of the specifications and submittal of all required data for approval.

d.  All warranties, which begin on the date of substantial completion as designated by the Owner, as described in Section 32.

e.  All pay applications must be in Construction Supervisors, Inc. main office by NOON every other Wednesday.

f.  Specification Section 9E – Furring and Lath.

g.  Specification Section 9F – Plaster (Stucco).

h.  Furnish and Install Stucco in compliance with plans and specifications for a complete turnkey job, including but not limited to the following:
1.  Includes an onsite superintendent.
2.  All plaster accessions are galvanized.
3.  All work is based on industry standards for materials, workmanship, and tolerances.
4.  All substrate and prerequisite work to be complete and ready to receive this subcontractors work.
5.  Deduct $6 per square foot for stucco already completed.
6.  Includes paper backed lath.

Federal ID: 27-1321033                                   SCHEAR HAMPTON DRYWALL, INC.
Vendor: SCHEHA                                            Page 1 of 13 – Subcontract #4237-64

7. All accessories to be galvanized.
8. Based on the most current set of plans.

3.3 It is understood and agreed that the Subcontract Work does not include:

a. Sealants or caulking of any kind.
b. Site trash chute/dumpsters for any waste or trash separation requirements.
c. Control lines, elevation benchmarks and scaffolding to accomplish this subcontractors work (provided by others).
d. Electric/power, water, and access (by others).
e. Shop drawings, sealants, backstop membrane, metal ceiling edges/stops or vapor retarder of any kind.
f. Scaffolding (provided and installed by others).

3.4. Subcontractor shall provide insurance certificates as shown in Section 16 of this Contract.

3.5. In addition to the foregoing insurance certificates, TEXAS WORKER'S COMPENSATION COMMISSION 85 FORM is enclosed for your signature, and must be returned with your signed Subcontract.

3.6. A copy of **CONSTRUCTION SUPERVISORS INC. SAFETY PROGRAM** is included with, and becomes a part of, this Subcontract. This **SAFETY PROGRAM** contains **CONSTRUCTION SUPERVISORS INC. DRUG AND ALCOHOL POLICY.** The Program is accepted by the Subcontractor and Subcontractor agrees to adhere to it as a minimum standard for this Project.

3.7. This Subcontractor is fully responsible for loss and /or damage to his material and the Subcontract Work, from whatever cause, prior to installation, connection, and acceptance of same by Contractor, regardless of whatever Builder's Risk Insurance may be in effect on the Project. Should the Subcontractor have a loss after installation, connection, and acceptance of work by Contractor, the Subcontractor will bear and be responsible for losses occasioned by whatever deductibles may apply to whatever Builder's Risk Insurance may be in effect on the Project.

3.8. Subcontractor shall immediately submit to Contractor's job superintendent in writing, the name, address and home telephone number of Subcontractor's designated project superintendent and of an alternate contact to be used during the absence of the project superintendent.

3.9. The attached schedule of values, once approved by Contractor, shall be used as the basis of monthly payments to the Subcontractor. It is understood that this is not a unit price contract and the schedule of values has no bearing on the actual values of work performed or to be performed. Please use the "Subcontractor Application for Payment" form each time you submit a draw for payment.

**YOUR DRAW WILL NOT BE PROCESSED UNLESS IT IS SUBMITTED ON THE ATTACHED FORM.**

3.10. Please mail application for payment for approval and/or payment to:
Construction Supervisors, Inc., 11111 Katy Freeway, Suite 120, Houston, Texas 77079-2114.

Federal ID: 27-1321033
Vendor: SCHEHA

Founders 000243

3.11. Architectural & Civil Plans issued by the Architect: Issue for Permit dated 10/31/11 unless otherwise noted. Sheets: Index; C1 & C2 dated 9/29/11; C3 dated 11/3/11; C4 dated 9/29/11; C5 & C6 dated 11/3/11; C7 dated 9/29/11; C8, C9, C10, & C11 dated 11/3/11; C12, C13, C14, C15, C16, C17, C18, & C19 dated 9/29/11; L1.01, L1.02, L1.03, L1.04, L2.01, L2.02, L2.03, L2.04, L2.05, L2.06, L3.01, L3.02, L4.01, L4.02, L4.03, L4.04, L5.01, L5.02, L6.01, & LS1.01 dated 11/14/11; A0.0, A0.0a, A0.0b, A0.1, A0.2, A0.3, A0.3a, A0.3b, A0.4, A0.4a, A0.4b, A0.4c, A0.4d, A0.5, A1.0, A1.0a, A1.1, A1.1a, A1.1b, A1.2, A1.2a, A1.2b, A1.3, A1.4, A1.5, A1.6, A1.7, A1.8, A1.9, A2.1, A2.1a, A2.2, A2.2a, A2.3, A2.4, A2.5, A2.6, A2.7, A2.8, A2.9, A2.10, A2.11, A3.1, A3.1a, A3.1b, A3.1c, A3.1d, A3.1e, A3.1f, A3.2, A3.2a, A3.2b, A3.2c, A3.2d, A3.2e, A3.3, A3.3a, A3.3b, A3.3c, A3.3d, A3.3e, A3.4, A3.4a, A3.4b, A3.4c, A3.4d, A3.4e, A3.5, A3.6, A3.7, A3.8, A3.9, A4.0, A4.1, A4.2, A4.3, A4.4, A4.5, & A4.6; A4.7 dated 4/27/07; A5.0, A5.1, A5.2, A5.3, A5.4, A6.0, A6.1, A10.1, A10.1a, A10.1b, A10.2, A10.2a, A10.2b, A10.3, A11.1, A11.2, A11.3, A11.4, A11.5, A11.6, A12.1, A12.2, A12.2a, A12.3, A12.3a, A12.4, A12.5, A12.6, A12.7, A12.8, & A12.9; S0.00, S1.00, S1.01, S1.02, S1.03, S1.10, S1.11, S1.12, S2.00, S2.01, S2.02, S2.03, S2.04, S2.05, S2.06, S3.10, S3.10A, S3.10C, S3.10D, S3.20, S3.20A, S3.20B, S3.20C, S3.20D, S4.10, S4.10A, S4.10C, S4.10D, S4.20, S4.20A, S4.20B, S4.20C, S4.20D, S4.30, S4.30A, S4.30B, S4.30C, S4.30D, S5.10, S5.10A, S5.10C, S5.10D, S5.20, S5.20A, S5.20B, S5.20C, S5.20D, S6.10, S6.10A, S6.10B, S6.10C, S6.10D, S7.01, S7.02, S7.03, S7.04, S7.05, S7.06, S7.07, S7.10, S7.11, S7.12, S7.13, S7.14, S7.15, S7.16, S7.17, S7.18, S7.19, S7.20, S7.21, S8.00, S8.10, S8.11, S8.21, S8.21, S8.30, S8.31, S8.32, S8.40, S8.41, S8.42, S9.01, S9.02, S9.03, S9.04, S9.05, S9.06, S9.07, S9.08, S10.01, S10.02, SC1.01, SC1.02, SC2.01, SC2.02, SC2.03, SC3.10, SC5.10, SC6.10, MEP-01, MEP-02, MEP-03, M-1.0, M-1.1, M-2.0, M-2.1, M-2.2, M-2.3, M-2.4, M-3.1, M-3.2, MP3.1, MP3.2, M-4.1.1, M-4.2.1, M-4.3.1, M-4.4.1, M-4.1.2, M-4.2.2, M-4.3.2, M-4.4.2, M-4.1.3, M-4.2.3, M-4.3.3, M-4.4.3, M-4.1.4, M-4.2.4, M-4.3.4, M-4.3.5, M-4.4.4, M-4.4.5, MP-4.1.1, MP-4.2.1, MP-4.3.1, MP-4.4.1, M-5.0.0, M-5.0.1, M-5.0.2, M-5.1.0, M-5.1.1, M-5.1.2, M-5.1.3, M-5.1.4, M-5.2.0, M-5.2.1, M-5.2.2, M-5.2.3, M-5.2.4, M-5.3.0, M-5.3.1, M-5.3.2, M-5.4.0, M-6.1, E-1.0, E-1.1, E-2.0, E-2.1, E-2.2, E-2.3, E-2.4, E-3.1.1, E-3.2.1, E-3.1.2, E-3.2.2, E-4.1.1, E-4.2.1, E-4.3.1, E-4.4.1, E-4.1.2, E-4.2.2, E-4.3.2, E-4.4.2, E-4.1.3, E-4.2.3, E-4.3.3, E-4.4.3, E-4.1.4, E-4.2.4, E-4.3.4, E-4.4.4, E-5.1, E-5.2, E-5.3, E-5.4, E-5.5, E-5.6, E-5.7, E-5.8, E-6.1, E-6.2, P-1.0, P-1.1, P-2.0, P-2.1, P-2.2, P-2.3, P-2.4, P-3.1.1, P-3.1.2, P-3.1.3, P-3.2.1, P-4.1.1, P-4.2.1, P-4.3.1, P-4.4.1, P-4.1.2, P-4.2.2, P-4.3.2, P-4.4.2, P-4.1.3, P-4.2.3, P-4.3.3, P-4.4.3, P-4.1.4, P-4.2.4, P-4.3.4, P-4.4.4, PU-4.1.1, PU-4.3.1, PU-4.1.2, PU-4.2.2, PU-4.3.2, PU-4.4.2, PU-4.4.3, PU-4.4.4, P-5.0, P-5.1, P-5.2, P-5.3, P-5.4, P-5.5, P-5.6, P-5.7, P-5.8, P-6.1, & P-6.2 dated 11/14/11; FP1, FP2, FP3, FP4, FP5, & FP6 dated 9/13/11; K1, K2, K3, K-1A, K-2A, & K-3A dated 9/20/11. Specifications dated 10/31/11. Addendum #1 dated 12/07/11. Addendum #2 dated 12/15/11.

Founders 000244

**Section 4.** Time is of the essence of this Subcontract. Subcontractor agrees to commence the Subcontract Work on Contractor's notice to proceed and to complete first that part of the Project which the Contractor must or desires completed first, and Subcontractor shall keep up with the Contractor's progress schedule and agrees to complete the Subcontract Work within the original Contract time plus any extension of Contract time allowed by the Owner. The Subcontractor shall keep itself thoroughly informed as to the progress of the job; begin work upon notification by the Contractor and prosecute the work continuously and uninterruptedly with all possible speed. The Subcontractor, however shall not be held responsible for any delays caused by the neglect of the Contractor. The Subcontractor agrees to prosecute the Subcontract Work, and the several parts thereof at such times and in such order as the Contractor considers necessary to keep the same sufficiently in advance of the other parts of the building and to avoid any delay in the completion of the construction as a whole. Subcontractor is unconditionally obligated to provide sufficient materials, equipment and a labor force consisting of a sufficient number of properly skilled workers to meet the Project schedule then applicable to the Subcontract Work. Contractor has sole discretionary authority to require Subcontractor to supplement its labor force, order overtime, or otherwise accelerate its performance to the extent deemed necessary by Contractor to ensure that the Subcontract Work progresses in accordance with the Project schedule. The Subcontractor shall reimburse the Contractor for any loss, damage, or extra expense paid or incurred by the Contractor, including but not limited to liquidated damages assessed against Contractor by Owner, which are due to Subcontractor's failure to deliver any and all materials as required, or to properly perform any and all work in keeping with the progress of the Contractor's schedule, or to properly perform any term, covenant or condition contained in this Subcontract, or which is due to the breach of any of the provisions of this Subcontract. It is further agreed that if the Subcontractor fails or refuses to proceed with the Subcontract Work as directed by the Contractor, or fails to perform said Subcontract Work in accordance herewith, in whole or in part, or fails to perform any term, covenant or condition contained in his Subcontract, the Contractor may upon written notice to the Subcontractor's last known address take any steps he deems advisable to secure necessary labor or materials by contract or otherwise, and may take over all or any part of the Subcontractor's equipment, materials, etc., and may prosecute the Subcontract Work to completion. In case the Contractor deems this procedure necessary for proper conduct of the Subcontract Work, all monies expended therefor shall be deducted from the Subcontract Sum herein stated, and if such expenditures exceed the amount otherwise due to the Subcontractor hereunder, the Subcontractor agrees to pay to the Contractor on demand the full amount of such excess, together with interest thereon at the rate of six percent per annum, until paid, and Contractor shall have the right to offset such amounts against payments then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor.

**Section 5.** Taxes. The Subcontract Sum includes all taxes applicable to the Subcontract Work.

**Section 6.** Applicable Laws and Codes. The Subcontract Work shall meet applicable local laws, ordinances, regulations and code requirements and Subcontractor is entirely responsible for having included the cost of all material, services, equipment and labor to satisfy these laws, ordinances, regulations and code requirements whether shown on the Contract Documents or not.

**Section 7.** Execution of this Subcontract signifies acceptance of all provisions of this Subcontract including all Exhibits attached hereto.

**Section 8.** Subcontractor is responsible to the job superintendent for scheduling of work and/or materials, but any directives received by this Subcontractor from the Contractor's Home Office personnel shall govern in case of conflict with the directions of the job superintendent.

**Section 9.** Safety, Environmental, Governing Authorities:

(a) The Subcontractor shall comply with all Local, State, Federal, and/or any Governing Authority ordinances, codes, regulations and laws pertaining to the project for the duration of the contract and warranty period. Subcontractor understands that this contract may be terminated if any Governing Authority determines that any breach of applicable codes, ordinances, regulations and laws has occurred and/or has not been corrected to the satisfaction of the Governing Authority.

(b) Subcontractor will observe Contractor's basic safety policies and procedures and all applicable provisions of the Occupational Safety and Health Act of 1970 and the regulations thereto and shall assist in maintaining working conditions which are free of unsanitary, hazardous, or dangerous conditions and shall assist in protecting the health and safety of any laborer or mechanic employed in the performance of this contract. Subcontractors performing work that requires the presence of a competent person (trenching/excavation, scaffolding, etc.), shall provide and maintain the appropriately trained competent person throughout the duration of the work. Subcontractor shall indemnify, defend and save harmless the Contractor and Owner from all liability and/or loss, without limit, incurred in whole or in part, directly or indirectly, as a result of any breach of the obligations in this Section 9(a) by Subcontractor, its agents, employees, materialmen and subcontractors. If any unsafe act or failure to adhere to OSHA or any other applicable

law, code, regulation or ordinance by Subcontractor results in the assessment of a civil penalty against Contractor, Subcontractor shall reimburse Contractor the amount paid therefore by Contractor on demand of Contractor and Contractor shall have the right to offset such amounts against payments then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor.

(c)    No alcoholic beverages, non-prescription drugs, or unsafe practices will be allowed on the job site. Subcontractor shall dismiss anyone participating in any of the above from the job site for the duration of the Project. Only prescription drugs with a doctor's authorization to perform construction activities will be allowed on the job site. Violation of this provision is a material breach of this Subcontract. The use, possession, sale, transfer, purchase or being under the influence of alcohol, drugs or any other illegal or unlawful substance by Subcontractor or Subcontractor's employees, or Subcontractor's sub-subcontractors and employees at any time at the job or while on company business is prohibited.

(d)    Subcontractor understands the terms and conditions of the general National Pollutant Discharge Elimination System (NPDES) permit or Texas Pollutant Discharge Elimination System (TPDES) permit, as applicable, or local variants thereof that authorizes stormwater discharges associated with industrial activity from the construction site. Subcontractor shall comply with the Stormwater Prevention Plan for the Project and shall indemnify, defend and hold Contractor harmless of and from any and all claims asserted against Contractor attributable to Subcontractor's acts or omissions with regard to the Stormwater Prevention Plan or the NPDES permit or TPDES permit or local variants thereof. If any such act or omission results in the assessment of a civil penalty against Contractor, Subcontractor shall reimburse Contractor the amount paid therefor by Contractor on demand of Contractor and Contractor shall have the right to offset such amounts against payments then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor.

(e)    <u>Employment Eligibility Verification and Indemnification:</u> Construction Supervisors, Inc. (hereinafter "CSI") requires that subcontractors providing services to CSI are in compliance with the Immigration Reform and Control Act of 1986, as amended, and the regulations promulgated thereunder, and that only individuals lawfully authorized to work in the United States are used to provide services to CSI by subcontractors. Accordingly, Subcontractor represents and warrants the following: (1) Subcontractor has complied, and shall at all times during the term of this Contract is in complete compliance, with all immigration laws, statutes, rules, and codes, including, without limitation, the Immigration Reform and Control Act of 1986, as amended, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and any successor statutes thereto and all orders and regulations promulgated thereunder, including, but not limited to, the prohibition against unlawful employment of unauthorized aliens as defined in 8 U.S.C. Section 1324a, and the prohibitions against unfair immigration-related employment practices a defined at 8 U.S.C. Section 1324b (hereinafter collectively referred to as "IRCA"). (2) Subcontractor further represents and warrants that all employees of Subcontractor's business being used to provide services to CSI were hired in compliance with IRCA and will continue to be employed in compliance with IRCA (including, but not limited to, timely I-9 verification and re-verification), and that each employee used by subcontractor to provide services to CSI is authorized to be employed in the United States and will maintain such employment authorization for as long as the employee is performing services for CSI. (3) Subcontractor agrees and warrants that it has established internal safeguards and reporting policies to ensure continued compliance with immigration laws and to encourage its employees to promptly report any suspected violations of immigration law to subcontractor's management. Subcontractor further warrants and agrees that it will respond in a timely fashion to any inspection or audit requests related to its immigration-related documents, including requests for inspection from CSI or any federal agency authorized to inspect or audit such documents. During the term of this Contract, Subcontractor shall, and shall cause its directors, officers, managers, agents and employees and subcontractors to, fully cooperate in all respects with any audit, inquiry, inspection or investigation that may be conducted by the United States Citizenship and Immigration Service ("USCIS"), the Department of Labor ("DOL"), or any other governmental agency or authority of Subcontractor or any of its employees. Subcontractor shall immediately notify CSI's authorized representative of any unscheduled inspection, raids, investigations, inquiries, visits or audits conducted by the USCIS, DOL, or any other governmental agency or authority related to environmental, immigration, or employee safety issues of Subcontractor, its agents, employees, or sub-Subcontractors. Subcontractor certifies that during the term of this Contract that an audit of I-9 Forms for its employees will be conducted and that it will promptly correct any deficiencies identified during the audit. (4) Subcontractor agrees to indemnify and to hold and save CSI harmless from and against any and all judgments, decrees, fines, penalties, costs, expenses, losses or liabilities, including attorneys' fee and legal costs that CSI may incur as a direct or indirect result of subcontractor's breach of the foregoing representation or warranties. Subcontractor further agrees that subcontractor will, upon request of CSI and at subcontractor's own expense, defend or assist in the defense of any suit or action or investigation that may be brought against CSI due to allegations which, if true, would be a breach by subcontractor of the foregoing representations or warranties. (5) See attached Certification of Compliance Affidavit, complete by an Officer and returned with your subcontract as evidence of compliance with provisions of the Federal Immigration and Control Act of 1986.

Federal ID: 27-1321033
Vendor: SCHEHA

<u>SCHEAR HAMPTON DRYWALL, INC.</u>
<u>Page 5 of 13 – Subcontract #4237-64</u>

Founders 000246

**Section 10.** <u>Subcontract Sum and Payment</u>. The Contractor agrees to pay the Subcontractor for the full and faithful performance of the Subcontract Work the sum of <u>**TWO HUNDRED THIRTY-FIVE THOUSAND DOLLARS ($235,000.00),**</u> in current funds, subject to additions and deductions for charges as may be agreed upon or provided for herein. Provided, that no payments will be made unless this Subcontractor's rate of progress, work done and material furnished are satisfactory to the Contractor and as herein agreed upon. Payments are to be made as follows:

<u>Draw requests are to be submitted by NOON every other Wednesday for work completed through that date. Payment will be made on the Friday following the period covered by the Application for Payment, less 10% retainage, provided payment for same has been made by Owner. The retainage will be paid within 30 days after acceptance by the Owner, provided payment for same has been made by Owner.</u> Contractor may require Subcontractor to furnish evidence satisfactory to Contractor, in the form of sworn affidavits, if requested, that all claims for labor, services, equipment and materials have been paid. It shall be a condition precedent to Contractor's obligation to make each payment (progress or final) to Subcontractor hereunder that the funds for such payment have first been paid by Owner to Contractor. It is the intent of the parties that if payment from the Owner for all or a portion of the Subcontract Work is never received by Contractor, then Contractor will never have any obligation to pay the Subcontractor for such portion of the Subcontract Work not paid by Owner. Subcontractor has expressly assumed the risk of Owner nonpayment and the Subcontract Sum in this paragraph 10 reflects the assumption of that risk.

Contractor shall be entitled to withhold payments (whether progress or final) from Subcontractor under the Subcontract to such extent as may be necessary, in Contractor's sole opinion, to protect the Contractor and/or Owner from loss on account of, but not limited to, the following: (i) defective work not remedied; (ii) third-party claims filed or reasonable evidence indicating the probability of the filing of such claims; (iii) failure of the Subcontractor to make payments properly and timely to its suppliers, materialmen or subcontractors or for labor, services, materials or equipment, (iv) evidence that the Subcontract Work cannot be completed for the unpaid balance of the Subcontract Sum, (v) damage caused by Subcontractor to the Owner, Contractor or other subcontractor; (vi) evidence that the Subcontract Work cannot be completed within the Project schedule; (vii) evidence that the Subcontractor is not able to provide adequate assurance of future performance with regard to the performance of correctable warranty work required by the Contract Documents; or (viii) any breach of a provision of this Subcontract.

**Section 11.** <u>Flow Down</u>. Subcontractor has read and is thoroughly familiar with the Contract Documents and agrees to be bound to Contractor by the terms of said Contract Documents insofar as they relate in any part or in any way to the Subcontract Work undertaken herein and to assume towards Contractor in connection with the Subcontract Work, all of the obligations and responsibilities which Contractor by those documents assumes towards the Owner or anyone else. The Subcontractor shall communicate about matters arising out of or relating to the Subcontract Work, the Contractor's work, the Contract Documents or this Subcontract only with the Contractor and not with the Owner or the Architect. In the event of a conflict between the terms of this Subcontract and the other Contract Documents, this Subcontract shall control.

**Section 12.** <u>Applications for Payment, Releases, Lien-Free Project</u>.
12.1 The Subcontractor shall submit to the Contractor's Home Office, requisition for payment, covering the value of the Subcontract Work completed to the satisfaction of the Owner during that month in accordance with the approved Schedule of Values (Section 3.9 of the Subcontract) and Section 10 above. If said requisitions are not delivered by the Subcontractor as per Section 3 and Section 10, payment may be withheld for an additional 30 days.

12.2 The Subcontractor shall furnish the Contractor with such partial releases and waivers of lien, in a form approved by Contractor, from Subcontractor and its materialmen and creditors as the Contractor may request from time to time on labor and/or material and/or other claims, and final releases and waivers of lien at the time of final payment on this Subcontract.

12.3 The Subcontractor shall furnish, if requested by the Contractor, sworn affidavits from time to time, in accordance with the form provided by the Contractor, which shall state amounts due or to become due, amounts paid, and any other information clearly to indicate the financial condition of the Subcontractor, insofar as it relates to labor, equipment and material furnished, and to be furnished, under this Subcontract, and the Contractor may take such steps as it may deem necessary to protect itself against any claims.

12.4 Subcontractor agrees to turn the Subcontract Work over to Contractor in good condition and free and clear from all claims, encumbrances and liens for labor, services, or materials, and should Subcontractor, during the progress of said Work or at any time thereafter, fail to pay for all labor, services and materials used or purchased for use in connection with the prosecution of said Work, Contractor may at its option and without notice to Subcontractor, pay all such claims and charge the amounts thereof to Subcontractor and Contractor shall have the right to offset such

Federal ID: 27-1321033
Vendor: SCHEHA

<u>SCHEAR HAMPTON DRYWALL, INC.</u>
<u>Page 6 of 13 – Subcontract #4237-64</u>

Founders 000247

amounts against payments then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor. In the event suit is filed by any person, firm or corporation asserting a claim or lien for labor, services or materials used or purchased for use in the Work covered by this Subcontract, Subcontractor will, at its own cost and expense, including counsel fees, defend such suit and pay any judgement rendered therein. Subcontractor, for itself, its successors and assigns, does hereby further expressly subordinates any and all claim of lien, lien or right to lien for labor performed or materials furnished by it hereunder which it may now or at any time hereafter have or be entitled to assert against Contractor, Owner or the Project in any manner connected with or arising out of his furnishing of labor and materials for the performance of that portion of the Work covered by this Subcontract or otherwise, whether any such claim of lien, lien or right to lien be contractual or arise under the provisions of any statute or law whatever of the state in which the Work is to be performed, to any lien or deed of trust of any Lender for the Project

12.5 The Subcontractor agrees that monies received for the performance of this Subcontract shall be applied to the cost of performing the Subcontract Work and said monies shall not be diverted to satisfy other obligations of the Subcontractor.

**Section 13.** The Subcontractor shall indemnify, defend and hold harmless the Owner and Contractor against all costs or claims for transportation, freight and express, on men, materials and equipment to and/or from the job, and for all other incidental expenses in connection with the Subcontract Work, and to prepay the transportation charges on all materials, etc., shipped.

**Section 14.** Prevailing Wage. The Subcontractor shall pay the scale of wages prescribed in the Contract, or the scale prescribed by law in case the Contract provides no such scale. If the Subcontractor shall fail in any respect to perform the covenants contained in this section, the Contractor shall have the option to terminate this Subcontract forthwith. If the Subcontractor's failure to pay the scale of wages prescribed in the Contract with the scale prescribed by law results in the assessment of any charges, penalties or fines against Contractor, Subcontractor shall reimburse Contractor the amount paid therefor by Contractor on demand of Contractor, and Contractor shall have the right to offset such amounts against payments then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor.

**Section 15.** Changes. Contractor may require changes in, deviations from, additions to, and omissions from, the Subcontract Work, and the Subcontract Sum shall be adjusted accordingly. Before proceeding with any change, deviation, addition or omission, the Subcontractor will first obtain written authorization from the Contractor, which authorization will state the amount, if any, by which the Subcontract Sum will be adjusted. The Subcontractor shall have no dealings with the Owner, or his authorized representatives in regard to changes, extras or omissions in connection with the Subcontract Work, but shall deal only with the Contractor. **Contractor's written order for changes, deviations, additions or omissions to the Subcontract Work shall be an express condition precedent to Subcontractor's right, if any, to receive payment for any such change, deviation, addition or omission.** Subcontractor's right to payment for changes, deviations, additions or omissions is further subject to the conditions in Section 10 of the Subcontract.

**Section 16.** Insurance. See Exhibit "A" , incorporated herein fully by reference, for insurance requirements.

**Section 17.** Applicable laws, taxes and permits.
(a) Subcontractor shall comply with all federal, state and municipal laws, codes, regulations and ordinances effective where the Subcontract Work is to be performed, and shall pay all taxes and contributions imposed or required by any law for any employment insurance, pensions, old age retirement funds, or similar purposes, in respect to the Subcontract Work and the employees of Subcontractor in the performance of said Subcontract Work.
(b) Subcontractor accepts exclusive liability for all taxes and contributions required of the Contractor or Subcontractor by the Federal Social Security Act and the unemployment compensation law or any similar law of any state, in respect to the employees of Subcontractor in the performance of the Subcontract Work and agrees to furnish Contractor with suitable written evidence that Subcontractor has been authorized to accept such liability. If Subcontractor fails to furnish such evidence prior to beginning of said Subcontract Work, Contractor may, at its option, pay or reserve for payment said taxes and contributions and deduct the amount so paid or reserved from payments due or thereafter to become due to Subcontractor. Subcontractor agrees to protect and hold harmless Contractor against all liability in respect to said employees under any of said laws.
(c) Subcontractor shall secure and pay for any and all permits and licenses required for the prosecution of the Subcontract Work covered by this contract.

**Section 18.** The Subcontractor shall route all equipment and materials to be used in the execution of this Subcontract as designated by the Contractor, providing the transportation costs are not increased by so doing. It is

Founders 000249

expressly agreed that the carrier so designated shall be the agent of the Subcontractor and not the agent of the Contractor.

**Section 19.** Assignment. It is expressly understood and agreed that the Subcontractor's responsibilities and obligations in the Subcontract are nondelegable personal services and that the Subcontractor shall not sublet, assign or transfer this Subcontract or any part thereof, including any monies due or to become due to Subcontractor hereunder, without Contractor's prior written consent. Contractor may conditionally assign this Subcontract to Owner or any Project Lender.

**Section 20.** Protection of Work. The Subcontractor shall effectually secure and protect its materials and work, and shall bear and be liable for all loss and/or damage or any kind in connection therewith at any time prior to the final completion and acceptance thereof, unless said loss or damage is caused by direct negligence of the Contractor and subject to the provisions of Section 24 hereof, to the extent they apply. The Subcontractor shall reimburse the Contractor on demand for any breakage or other damage to other work or materials occasioned by the Subcontractor in the execution of this Subcontract.

**Section 21.** If the Subcontractor deems that surfaces or work to which the Subcontract Work is to be applied or affixed is unsatisfactory or unsuitable, written notification of said condition shall be given to the Contractor, otherwise Subcontractor shall have no claim for extra compensation or non-responsibility in connection therewith.

**Section 22.** Temporary Services, Utilities, Use of Equipment. When needed by it, Subcontractor shall furnish the following facilities for its own use, or pay its pro-rata share of same for the entire construction period: temporary toilets, job sheds, storage and warehouse space, temporary water, power, heat, gas and telephone , drinking water, scaffolding, barricades, night watchman, shoring and underpinning, vertical transportation, hoisting equipment, and any other service or facility applicable to his particular scope of work. If Subcontractor uses any equipment owned or rented by Contractor, Subcontractor shall indemnify, defend and hold harmless Contractor of and from any and all liability for claims which may result from Subcontractor's use of such equipment. This shall include reimbursement by Subcontractor for loss or damage to the equipment itself. Subcontractor shall additionally ensure that any employee assigned to operate such equipment shall be fully trained in the safety and proper operation of the equipment.

**Section 23.** Clean-Up. The Subcontractor shall clean up and remove from the site as directed by the Contractor, all rubbish and debris resulting from the Subcontract Work. It shall also clean up to the satisfaction of the Owner, Architect and Contractor, all dirt, grease, marks, etc., from walls, ceilings, floors, fixtures, etc., deposited or placed thereon as a result of the Subcontract Work. If the Subcontractor refuses or fails to perform this cleaning as directed by the Contractor, the Contractor shall have the right and power to proceed with said cleaning, and the Subcontractor will on demand repay to the Contractor the actual cost of said labor plus a percentage of such cost to cover supervision, insurance, overhead, etc.

**Section 24.** Builder's Risk Insurance; Deductibles. It is understood and agreed it has been the practice of the Contractor to carry Builder's Risk Fire Insurance in the amount of his estimate of full insurance to insurable value, including subcontracts. To the extent that such insurance is carried by the Contractor under the Contract, the Subcontractor will have an interest in the insurance policy; however, the provisions of this Section do not require the Contractor to carry any insurance whatsoever for the benefit of the Subcontractor. Subcontractor assumes the responsibility to determine whether Builder's Risk Insurance is in force, its limits and deductibles. Subcontractor is fully responsible for loss and damage to its property on the site, including tools and equipment, and shall take necessary precautions to prevent vandalism, theft, burglary, pilferage and unexplained disappearance of property. Any insurance covering Subcontractor's or its sub-subcontractors' property shall be Subcontractor's and its sub-subcontractors' sole and complete means of recovery for any such loss. To the extent any loss is not covered by said insurance or is subject to any deductible or co-insurance, Subcontractor shall not be reimbursed for same. Should Subcontractor or its sub-subcontractors choose to self-insure this risk, it is expressly agreed that Subcontractor hereby waives, and shall cause its sub-subcontractors to waive, any claim for damage or loss to said property in favor of Owner and Contractor. Subcontractor shall bear all deductibles with respect to the Subcontract Work in connection with any Builder's Risk Insurance. In the event the Contractor procures Builder's Risk Insurance, and only in such event, the Subcontractor agrees to submit immediately, for the purpose of determining values under the insurance coverage, a complete breakdown of the Subcontract Sum showing materials, labor, expendable tools, supplies or any other thing or article of value, the cost of which is included in the Subcontract Sum stated in this Subcontract.

**Section 25.** Shop Drawings; Submittals. Subcontractor shall submit to Contractor with such promptness as to cause no delay in the Subcontract Work or in the work of Contractor or any other subcontractor all shop or setting drawings, material submittals, samples, mock-ups, product data and schedules required for the Subcontract Work (collectively

Founders 000250

referred to in this section as "Submittals) and Contractor shall pass upon such Submittals, with reasonable promptness, making desired corrections, including, but not limited to, corrections relating to design and artistic effect. Contractor's, Owner's, Architect's or Engineer's approval of such Submittals shall not, however, relieve Subcontractor from responsibility for deviations from the Contract Documents, unless Subcontractor has in writing called Contractor's attention to such deviations at the time of the submission of such Submittals to Contractor, and secured Contractor's written approval to any such deviations, nor shall Contractor's, Owner's, or Architect's or Engineer's approval of any such Submittals, relieve Subcontractor from responsibility for errors in such Submittals. Subcontractor will be required to submit a minimum of (6) copies of all shop drawings. By submitting Submittals, the Subcontractor represents that the Subcontractor has determined and verified materials, field measurements and field construction criteria related thereto and has checked and coordinated the information contained within such Submittals with the requirements of the Work and of the Contract Documents. All transportation costs on samples and drawings furnished by the Subcontractor shall be paid by Subcontractor.

**Section 26.** Project Close-Out. The Subcontractor shall furnish all guaranties, bonds, training, O&M manuals, operating instructions, etc., as required by the Contract Documents with respect to the Subcontract Work as a condition precedent to Final Payment. Subcontractor shall fully complete to the Owner's and Contractor's satisfaction all punchlist work within thirty (30) days of Substantial Completion or such lesser time as may be required by the Contract Documents.

**Section 27.** Dispute Resolution. If at any time any controversy shall arise between the Contractor and the Subcontractor arising out of or relating to the Subcontract Work or the Subcontract, and which the parties hereto do not promptly adjust and determine, or which the Owner or his authorized representatives cannot decide to the satisfaction of both parties hereto, then the written orders of the Contractor shall be followed and Subcontractor shall continue with the Subcontract Work and said controversy shall be decided by binding arbitration pursuant to the Construction Industry Rules of the American Arbitration Association then in effect at the end of the work, and before final settlement is made between the Contractor and Subcontractor and the parties agree to be bound by any award granted therein. Any such award may be enforced in a court of competent jurisdiction. The parties agree that the Subcontract shall be governed by the laws of the State of Texas and that venue for any controversy arising hereunder shall lie in Harris County, Texas. Subcontractor consents to be joined in any arbitration proceeding between Owner and Contractor that, in whole or in part, arises out of or relates to the Subcontract or the Subcontract Work. Provided, however, that if any lawsuit or lawsuits between the Owner and Contractor or the Contractor and any third party involve, arise out of or relate to the Subcontract Work or the Subcontract, and the Contract does not provide for arbitration or there is no arbitration agreement between Contractor and such third party, Subcontractor agrees that the foregoing arbitration agreement shall not be enforced and that Contractor may join Subcontractor in the said lawsuit or lawsuits.

Section 28. INDEMNIFICATION. TO THE FULLEST EXTENT PERMITTED BY LAW, THE SUBCONTRACTOR EXPRESSLY AGREES TO DEFEND (AT THE SUBCONTRACTOR'S EXPENSE AND WITH LEGAL COUNSEL ACCEPTABLE TO THE CONTRACTOR), INDEMNIFY AND HOLD HARMLESS OWNER, CONTRACTOR, ARCHITECT, ARCHITECT'S CONSULTANTS, ENGINEER, CONSTRUCTION MANAGER, LENDER AND ANY OTHER PARTY WHICH CONTRACTOR HAS AGREED TO INDEMNIFY AS NAMED OR REFERENCED IN THE PROJECT CONTRACT DOCUMENTS MADE A PART OF THIS SUBCONTRACT AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, SUCCESSORS, AFFILIATES AND ASSIGNS (HEREINAFTER COLLECTIVELY THE "INDEMNIFIED PARTIES") FROM AND AGAINST ANY AND ALL CLAIMS, SUITS, LOSSES, CAUSES OF ACTION, DAMAGES, LIABILITIES, FINES, PENALTIES AND EXPENSES OF ANY KIND WHATSOEVER INCLUDING WITHOUT LIMITATION, ARBITRATION OR COURT COSTS AND ATTORNEYS FEES, FOR ANY INJURIES TO ANY PERSON (INCLUDING RESULTING DEATH) OR ANY AND ALL DAMAGES TO PROPERTY INCLUDING LOSS OF USE THEREOF, ARISING OUT OF, OCCASIONED, CONTRIBUTED TO OR IN ANY WAY CAUSED OR ALLEGED TO ARISE OUT OF, BE OCCASIONED, CONTRIBUTED TO OR IN ANY WAY CAUSED, IN WHOLE OR IN PART, BY THE ACTS OR NEGLIGENCE OF SUBCONTRACTOR, ITS EMPLOYEES, AGENTS, REPRESENTATIVES, SUBCONTRACTORS OR SUPPLIERS OR THEIR AGENTS OR EMPLOYEES OR ANYONE ELSE FOR WHOSE ACTS THEY MAY BE LIABLE, OR IN ANY WAY ARISING OUT OF, CONNECTED WITH OR INCIDENT TO OR ALLEGED TO ARISE OUT OF, BE CONNECTED WITH OR INCIDENT TO THE PERFORMANCE OF THE WORK COVERED BY THIS SUBCONTRACT BY WHOMEVER PERFORMED, REGARDLESS OF WHETHER SUCH INJURY, DEATH OR DAMAGE IS CAUSED IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY ONE OR MORE OF THE "INDEMNIFIED PARTIES", THEIR OFFICERS, AGENTS AND EMPLOYEES. SUCH OBLIGATIONS SHALL NOT BE CONSTRUED TO NEGATE, ABRIDGE, OR REDUCE OTHER RIGHTS OR OBLIGATIONS OF INDEMNITY WHICH WOULD OTHERWISE EXIST AS TO A PARTY OR PERSON DESCRIBED IN THIS PARAGRAPH.

The defense and indemnification obligations under this Subcontract shall not be restricted in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under workers' compensation act, disability benefit act, or other employee benefit act and shall extend to and include any actions brought

by or in the name of any employee of the Subcontractor or of any third party to whom the Subcontractor may subcontract a part or all of the Subcontract Work.

The defense and indemnification obligations under this Subcontract are not intended to and shall not require Subcontractor to indemnify or hold harmless a registered architect, licensed engineer or an agent, servant or employee of a registered architect or licensed engineer from liability for damage that is (1) caused by or results from: (a) defects in plans, designs or specifications prepared, approved or used by the architect or engineer; or (b) the negligence of the architect or engineer in the rendition or conduct of professional duties called for or arising out of the construction contract and the plans, designs or specifications that are a part of the construction contract; and (2) arises from personal injury or death, property injury; or any other expense that arises from personal injury, death or property injury.
These indemnity obligations shall survive termination of this Subcontract.

**Section 29.** The Subcontractor shall not place on the Project any equipment of which it is not sole owner unless it obtains written permission from the Contractor.

**Section 30. Anti-discrimination.**
(a) The Subcontractor, in performing the Subcontract Work, shall not discriminate against any employees or applicants for employment because of race, creed, color, national origin, or sex.
(b) The Subcontractor agrees that the provisions of subsection (a) above will also be inserted in all of its subcontracts. For the purpose of this section, a "subcontract" is defined as any contract entered into by the subcontractor with any individual, partnership, association, corporation, estate or trust, or other business enterprise or other legal entity, for a specific part of the work to be performed in connection with the supplies or services furnished under this Subcontract; provided, however, that a contract for the furnishing of standard or commercial articles or raw materials shall not be considered as a subcontract.

**Section 31. Delays.**
(a) Contractor shall not be liable to Subcontractor for any delay, hindrance or interference to the Subcontract Work resulting from the act, negligence or default of the Owner or the Architect, or by reason of fire or other casualty, or on account of riots, strikes or other combined action of the workmen or others, or on account of any acts of God or any other cause beyond Contractor's control or on account of any circumstances caused or contributed to by this Subcontractor.
(b) Should Contractor delay, hinder or interfere with the Subcontract Work, then and in such event Contractor shall owe Subcontractor therefor only an extension of time for completion equal to the delay caused, and then only if written claim is made to Contractor within forty-eight (48) hours from the beginning of the delay, hindrance or interference. Subcontractor shall not be entitled to any claim for damages or increased costs occasioned by any such delay.

**Section 32.** Warranty. Subcontractor warrants to the Owner, the Architect and the Contractor that all materials and equipment furnished shall be new unless otherwise specified, and that all Subcontract Work shall be of good quality, free from faults and defects and in conformance with the Contract Documents. Subcontractor shall at its sole cost, inspect the Subcontract Work in place upon the request by Owner, Architect or Contractor to investigate any alleged defect in the Subcontract Work and shall promptly replace defective materials, workmanship and equipment and re-execute defective work as required of the Contractor under the Contract Documents. If within one (1) year from the date of substantial completion of the Project, or such longer period of time as may be prescribed by law or by the terms of any applicable special warranty required by the Contract Documents, any of the Subcontract Work is found to be defective or not in accordance with the Contract Documents, Subcontractor shall, at its sole cost, correct it and any other work affected thereby promptly after receipt of a written notice from the Contractor to do so. This one year time period for correction by Subcontractor is in addition to, and not in lieu of, all warranties that exist at common law or by statute. These warranty obligations shall survive the termination of the Subcontract. In the event Subcontractor fails to perform during said warranty period, Contractor may, at its discretion, use other means to provide the warranty service and deduct cost of same from funds then or thereafter due Subcontractor under this or any other agreement with Contractor.

**Section 33.**
(a) Subcontractor agrees to work its crews on Saturday if requested by General Contractor.
(b) Subcontractor agrees to proceed with its phase of the work in the event of picketing or strike.

Founders 000252

(c) Subcontractor agrees to furnish, upon completion of the Subcontract Work, and prior to final payment therefor, a letter from the manufacturer (s) of all major pieces of equipment furnished by him stating that the installation thereof has been done in accordance with recommendation of said manufacturer(s) and that said manufacturer(s) will honor any and all warranties and/or guarantees normally given on their equipment.

(d) Subcontractor will submit labor and/or material releases with each payment request.

(e) Subcontractor will furnish Contractor with a copy of its authorization to do business in the municipality in which the Subcontract Work is located.

(f) Subcontractor shall furnish separate Performance and Payment Bonds covering the Subcontract at its sole expense. Said bonds shall be delivered to Contractor prior to the first payment request and shall be in a form and with a surety acceptable to Contractor.

**Section 34.** Inspection of Work; Defective Work. Subcontractor shall provide sufficient safe and proper facilities at all times for the inspection of the Subcontract Work by Owner, Lenders, Contractor, any Architect, Engineer or other design consultant employed in connection with the Work or their authorized representatives, and shall within twenty-four (24) hours after receiving written notice from Contractor to that effect, proceed to take down all portions of the Subcontract Work and remove from the grounds and buildings all material, whether worked or unworked, which Contractor or any such Owner, Architect, Engineer or other design consultant shall condemn as unsound or improper or as failing to conform in any way to the Contract Documents, and shall make good all such work condemned and all other work damaged or destroyed in removing or making good such condemned work. However, Subcontractor shall not remove any other materials from the building site without Contractor's written permission. Should the Subcontractor refuse or neglect to proceed at once with the correction or rejected or defective materials and/or workmanship after receiving notice to do so, it is agreed that the Contractor shall have the right and power to have the defects remedied or changes made at the expense of the Subcontractor, and the Subcontractor agrees to pay to the Contractor on demand any and all loss and/or expense paid or incurred by the Contractor in remedying such defects and/or making such changes, together with interest thereon at the rate of six per cent per annum, until paid. Contractor shall be entitled to deduct such loss and/or expense from sums then or thereafter due Subcontractor under this Subcontract or any other agreement with Contractor.

**Section 35.** Default; Termination; Termination for Convenience.

(a) Should Subcontractor at any time refuse or neglect in Contractor's opinion to supply a sufficient number of properly qualified workmen or a sufficient quantity of materials of proper quality, or abandon the Subcontract Work or fail in any respect to prosecute the Subcontract Work with promptness and diligence, or fail in the performance of any of the agreements herein contained, Contractor may, at its option and without prejudice to any other remedy it may have, after forty-eight (48) hours' written notice to Subcontractor a) supplement Subcontractor's forces and provide any such labor, equipment and materials and deduct the cost thereof from any money then due or thereafter to become due to Subcontractor under this Subcontract or any other agreement with Contractor; or b) Contractor may, at its option and without prejudice to any other remedy it may have, terminate this Subcontract or any part thereof and for the purpose of completing and/or correcting the Subcontract Work, Contractor shall have the right to take possession of all the materials, equipment tools and appliances belonging to Subcontractor at the site of the work together with any specially ordered or fabricated materials or equipment for the Project, and Contractor may either complete and/or correct said Subcontract Work itself or may employ, or contract with, any other person or persons to complete and/or correct said Subcontract Work and provide the materials therefor applying the then unpaid portion of the amount to be paid under this Subcontract toward the payment of all costs of such completion and/or correction; and in case of such termination of this Subcontract, Subcontractor shall not be entitled to receive any further payment under this Subcontract until said Subcontract Work shall have been finished completely and payment therefor made by Owner, at which time if the balance of the unpaid portion of the amount to be paid under this Subcontract then remaining exceeds the charges, expenses and any damages sustained by Contractor in completing and/or correcting said work or as a result of such default by Subcontractor, such excess shall be paid by Contractor to Subcontractor, but if such charges, expenses and damages shall exceed such balance, Subcontractor and its surety shall forthwith pay the difference to Contractor upon demand and Contractor may deduct such difference from any payments otherwise due or to become due to Subcontractor under this Subcontract or any other agreement with Contractor.

(b) Contractor may, at its sole discretion, by written notice to Subcontractor, terminate this Subcontract, in whole or in part, when Contractor determines that it is in the best interest of Contractor to do so. Upon receipt of twenty-four (24) hours written notice from Contractor, Subcontractor shall take all reasonable measures after consultation with Contractor to terminate or assign to Contractor all subcontracts, purchase orders, or other commitments related to the Subcontract Work or the Project on terms and conditions acceptable to Contractor. Subcontractor will be paid for all reasonable costs of all work and/or services performed and materials furnished under the Subcontract including reasonable overhead and profit on all Work and/or services performed and materials furnished hereunder, subject to any reasonable backcharges of Contractor attributable to Subcontractor's failure to comply with any of the provisions of this Subcontract and further subject to the other terms of this Subcontract

Founders 000253

regarding payment. In no event will Subcontractor received any payment or compensation whatsoever for interruption of business or lost business opportunities, any other item of consequential damages, for overhead or loss of profits on the unperformed Subcontract Work and/or services and unfurnished materials or for any intangible, impact or similarly described costs, damages or expenses and under no circumstances shall the total sum paid to or received by Subcontractor under this Subcontract exceed the Subcontract Sum.

(c)    Contractor's exercise of its rights of termination hereunder shall be in addition to and not in lieu of any other remedies or rights of Contractor under this Subcontract or at law. In the event this Subcontract is terminated for cause or for convenience, Subcontractor agrees to assign to Contractor or others, Subcontractor's rights under any purchase order or subcontract related to the Subcontract Work.

(d)    It is recognized that: if an order for relief is entered on behalf of Subcontractor pursuant to Title 7 or Title 11 of the United States Bankruptcy Code, if another similar order is entered under any other Debtor relief laws, if Subcontractor makes a General Assignment for the benefit of its Creditors, if a Receiver is appointed for the benefit of its Creditors, or if a Receiver is appointed on account of its insolvency, any such event could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its successor-in-interest adequate assurance of future performance in accordance with the terms and conditions of the Subcontract. Failure to comply with such request within ten (10) days of the delivery of the request shall entitle Contractor to terminate the Subcontract and to the rights set forth above in Section 35(a) hereof. In all events, absent receipt of adequate assurance of performance and actual performance in accordance therewith, Contractor shall be entitled to proceed with the Work with its own forces or with other subcontractors, at Subcontractor's expense.

**Section 36.**  <u>Lien-Free Project; Indemnity from Liens and Claims, Patents</u>. Subcontractor shall defend, indemnify and save harmless Contractor and Owner from any and all laborer's, materialmen's and mechanic's liens upon the property and premises on which the Subcontractor Work is being performed that arise out of such work, and shall keep such property free and clear of all liens, claims and encumbrances arising out of the performance of this Subcontract. Subcontractor shall defend, indemnify and save harmless Contractor and its surety from any claims or causes of action asserted against Contractor's surety bonds issued in connection with the Project. Subcontractor shall defend, indemnify and save harmless Contractor and Owner from any claims or suits for infringement of patents or violation of patent rights by Subcontractor. If Subcontractor fails to do any of the foregoing, Contractor may deduct from sums then or thereafter due Subcontractor under this Subcontract or other agreement with Contractor such amounts as Contractor may deem appropriate to defend, indemnify and save harmless Contractor and Owner from such liens, claim, encumbrances and suits.

**Section 37.**  <u>Cutting and Patching</u>. Subcontractor shall do all cutting, fitting, patching, digging and back filling of the Subcontract Work undertaken herein that may be required to make its several parts come together properly and fit it to receive or be received by work of Contractor or any other subcontractor shown upon, or reasonably implied by, the Contract Documents for the completed structure. Any cost caused by defective or ill-timed work of Subcontractor shall be borne by Subcontractor. Subcontractor shall not endanger any work by cutting, excavating or otherwise altering the Subcontract Work undertaken herein and shall not cut or alter the work of Contractor or any other subcontractor save with the prior written consent of Contractor.

**Section 38.**  <u>Independent Contractor</u>. Subcontractor shall be an independent contractor under this Subcontract and shall assume all of the rights, obligations, and liabilities applicable to it as such an independent contractor hereunder. Subcontractor is responsible for the means, methods, and details of the Subcontract Work.

**Section 39.**  No payment made under this Subcontract shall be construed to be an acceptance by Contractor or Owner of defective work, improper materials or work that does not conform to the Contract Documents.

**Section 40.**  <u>Maintenance of Records; Audit</u>. Subcontractor shall keep and maintain full and detailed records and accounts of all materials, equipment and labor furnished, delivered, fabricated, used, consumed and/or incorporated into the Subcontract Work. Contractor shall be given complete and convenient access to all of Subcontractor's records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda and similar documents and data relating to the Subcontract and the Subcontract Work. Subcontractor shall maintain and preserve all such records and documents for a period of three (3) years after final payment hereunder and shall make such records and documents available to Contractor at any time within this three-year period.

**Section 41.**  <u>Inspection of Site</u>. Subcontractor represents that it has examined all of the Contract Documents which relate to the Subcontract Work and is fully acquainted with all of the physical conditions surrounding the job site (as that term may be defined in the Contract) insofar as the same affects or relates to the performance of the Subcontract Work, and has made all necessary investigations essential to the full understanding of any and all difficulties that may

Founders 000254

be encountered in the performance of the Subcontract Work. Subcontractor assumes any and all risks incident to any variance between the actual physical conditions at the job site affecting the Subcontract Work and those set out in the Contract Documents.

**Section 42.** Notice. All notices to Contractor due under the Subcontract shall be addressed to Contractor at its offices as appears on the first page hereof. All notices to be given Subcontractor shall be addressed to Subcontractor at the office of Subcontractor as appears on the first page hereof. Notices may be delivered by U.S. Mail, hand delivery or facsimile. It is understood and agreed that the effective date of any such notice shall be: (i) two (2) days after the date the notice is posted with the U.S. Mail, (ii) the date of hand delivery, or (iii) the date the facsimile is transmitted, but any notice by facsimile shall be deemed to be given on the following calendar day if sent after 5:00 p.m.

**Section 43.** Severability. The provisions of this Subcontract shall be applied and interpreted in a manner consistent with each other so as to carry out the purposes and intent of the parties, but if for any reason any provision or part thereof is unenforceable or invalid, such provisions or parts thereof shall be deemed severed from this Subcontract and the remaining provisions shall be carried out with the same force and effect as if the severed provision or part thereof had not been part of this Subcontract.

**Section 44.** Headings. The headings of the paragraphs are included solely for the convenience of reference and if there is any conflict between the headings and the text of this Subcontract, the text of this Subcontract shall control.

**Section 45.** Non-Waiver. The wavier of any breach hereof shall not constitute a waiver of any subsequent breach by the same or other provision hereof. Failure by the Contractor in any instance to insist upon observance or performance by Subcontractor shall not be deemed a waiver by Contractor of any such observance or performance. No waiver will be binding upon Contractor unless in writing and then will be for the particular instance only. Payment of any sum by Contractor to Subcontractor with knowledge of any breach or default will not be deemed any waiver of such breach or any other breach.

**Section 46.** Entire Agreement. This Subcontract and the Contract Documents insofar as they relate in any part or any way to the Subcontract Work, constitute the entire agreement between parties hereto, and it is expressly understood and agreed that there are no oral or written agreements or promises by and between said parties except as aforesaid and that any additions thereto or changes therein shall be in writing.

**NOTE:** Subcontractor must file proof of insurance with Contractor prior to starting work and as a condition precedent to payment. All invoices must be signed "APPROVED" by job superintendent prior to submission for payment.

IN WITNESS WHEREOF, the parties hereto have executed this agreement for themselves, their heirs, executors, successors, administrators and assigns, on the day and year first above written.

SUBCONTRACTOR:                          CONTRACTOR:

SCHEAR HAMPTON DRYWALL, LLC             CONSTRUCTION SUPERVISORS, INC.

\# By: _Jim B Smith_                      By: _John Black_

Printed Name: _Jim B Smith_             Printed Name: _John Black_

Title: _Partner_                         Title: _President_

\# See Additions to Contract
That is ATTACHED

Federal ID: 27-1321033
Vendor: SCHEHA

Founders 000255

Schear Hampton Drywall, Inc.
Subcontract #4237-64
Additions to Contract

1. Agreed upon schedule.
2. Right to piece work & subcontractor will maintain I-9 forms.
3. Right to stop work for lack of payment or unsafe conditions.
4. W.O., extras, back charges, etc., only by G.C. & subcontractor signed change order.
5. Waivers upon payment or conditional waivers as per Texas statue.
6. Submittal approval is acceptance of product application/substitution as long as substitution is clearly identified in submittals.
7. Insurance umbrella is (excess) $2,000,000.00, insurance as attached.
8. Payment guaranteed by the 30th of the month following billing.
9. Retention is 5% on labor and material and paid with 30 days of scope completion, and the following 5% to be paid when General Contractor gets paid.
10. No 3rd party contingencies or contracts.
11. This is a complete contract. Those things typed or hand written provisions shall control and be prevailing on all parties if in conflict of this contract.
12. Subcontractor is not responsible for others damaging work, material, or equipment.


SCHEAR HAMPTON DRYWALL, INC.                    CONSTRUCTION SUPERVISORS, INC.

_Jim B Smith ceo_                                _John Black_

Jim Smith, Partner                               John Black, President

PROPERTY CODE

TITLE 5. EXEMPT PROPERTY AND LIENS

SUBTITLE B. LIENS

CHAPTER 53. MECHANIC'S, CONTRACTOR'S, OR MATERIALMAN'S LIEN

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 53.001. DEFINITIONS. In this chapter:
(1) "Contract price" means the cost to the owner for any part of construction or repair performed under an original contract.
(2) "Improvement" includes:
(A) abutting sidewalks and streets and utilities in or on those sidewalks and streets;
(B) clearing, grubbing, draining, or fencing of land;
(C) wells, cisterns, tanks, reservoirs, or artificial lakes or pools made for supplying or storing water;
(D) pumps, siphons, and windmills or other machinery or apparatuses used for raising water for stock, domestic use, or irrigation; and
(E) planting orchard trees, grubbing out orchards and replacing trees, and pruning of orchard trees.
(3) "Labor" means labor used in the direct prosecution of the work.
(4) "Material" means all or part of:
(A) the material, machinery, fixtures, or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;
(B) rent at a reasonable rate and actual running repairs at a reasonable cost for construction equipment used or reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or
(C) power, water, fuel, and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.
(5) "Mechanic's lien" means the lien provided by this chapter.

reclaimed from overflow, or the railroad and all of its properties, and to each lot of land necessarily connected or reclaimed.

(b) The lien does not extend to abutting sidewalks, streets, and utilities that are public property.

(c) A lien against land in a city, town, or village extends to each lot on which the house, building, or improvement is situated or on which the labor was performed.

(d) A lien against land not in a city, town, or village extends to not more than 50 acres on which the house, building, or improvement is situated or on which the labor was performed.

Acts 1983, 68th Leg., p. 3536, ch. 576, Sec. 1, eff. Jan. 1, 1984.


Sec. 53.023. PAYMENT SECURED BY LIEN. The lien secures payment for:

(1) the labor done or material furnished for the construction or repair;

(2) the specially fabricated material, even if the material has not been delivered or incorporated into the construction or repair, less its fair salvage value; or

(3) the preparation of a plan or plat by an architect, engineer, or surveyor in accordance with Section 53.021(c).

Acts 1983, 68th Leg., p. 3536, ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by Acts 1995, 74th Leg., ch. 851, Sec. 2, eff. Sept. 1, 1995.


Sec. 53.024. LIMITATION ON SUBCONTRACTOR'S LIEN. The amount of a lien claimed by a subcontractor may not exceed:

(1) an amount equal to the proportion of the total subcontract price that the sum of the labor performed, materials furnished, materials specially fabricated, reasonable overhead costs incurred, and proportionate profit margin bears to the total subcontract price; minus

(2) the sum of previous payments received by the claimant on the subcontract.

Acts 1983, 68th Leg., p. 3536, ch. 576, Sec. 1, eff. Jan. 1, 1984.

loss it suffers or incurs. That priority does not excuse the surety from paying any obligations that it may have under its payment bonds.

Acts 1983, 68th Leg., p. 3548, ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 20, eff. Sept. 1, 1989.

Sec. 53.152. RELEASE OF CLAIM OR LIEN. (a) When a debt for labor or materials is satisfied or paid by collected funds, the person who furnished the labor or materials shall, not later than the 10th day after the date of receipt of a written request, furnish to the requesting person a release of the indebtedness and any lien claimed, to the extent of the indebtedness paid. An owner, the original contractor, or any person making the payment may request the release.

(b) A release of lien must be in a form that would permit it to be filed of record.

Acts 1983, 68th Leg., p. 3548, ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 21, eff. Sept. 1, 1989.

Sec. 53.153. DEFENSE OF ACTIONS. (a) If an affidavit claiming a mechanic's lien is filed by a person other than the original contractor, the original contractor shall defend at his own expense a suit brought on the claim.

(b) If the suit results in judgment on the lien against the owner or the owner's property, the owner is entitled to deduct the amount of the judgment and costs from any amount due the original contractor. If the owner has settled with the original contractor in full, the owner is entitled to recover from the original contractor any amount paid for which the original contractor was originally liable.

Acts 1983, 68th Leg., p. 3548, ch. 576, Sec. 1, eff. Jan. 1, 1984.

Sec. 53.154. FORECLOSURE. A mechanic's lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

Acts 1983, 68th Leg., p. 3549, ch. 576, Sec. 1, eff. Jan. 1, 1984.

Sec. 53.155.  TRANSFER OF PROPERTY SOLD.  If the house, building, improvement, or any piece of railroad property is sold separately, the officer making the sale shall place the purchaser in possession.  The purchaser is entitled to a reasonable time after the date of purchase within which to remove the purchased property.

Acts 1983, 68th Leg., p. 3549, ch. 576, Sec. 1, eff. Jan. 1, 1984.

Sec. 53.156.  COSTS AND ATTORNEY'S FEES.  In any proceeding to foreclose a lien or to enforce a claim against a bond issued under Subchapter H, I, or J or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court shall award costs and reasonable attorney's fees as are equitable and just.  With respect to a lien or claim arising out of a residential construction contract, the court is not required to order the property owner to pay costs and attorney's fees under this section.

Added by Acts 1984, 68th Leg., 2nd C.S., ch. 18, Sec. 4(a), eff. Oct. 2, 1984.  Amended by Acts 1989, 71st Leg., ch. 1138, Sec. 22, eff. Sept. 1, 1989.
Amended by:
Acts 2011, 82nd Leg., R.S., Ch. 51 (S.B. 539), Sec. 1, eff. September 1, 2011.

Sec. 53.157.  DISCHARGE OF LIEN.  A mechanic's lien or affidavit claiming a mechanic's lien filed under Section 53.052 may be discharged of record by:
(1)  recording a lien release signed by the claimant under Section 53.152;
(2)  failing to institute suit to foreclose the lien in the county in which the property is located within the period prescribed by Section 53.158, 53.175, or 53.208;
(3)  recording the original or certified copy of a final judgment or decree of a court of competent jurisdiction providing for the discharge;

(4) filing the bond and notice in compliance with Subchapter H;

(5) filing the bond in compliance with Subchapter I; or

(6) recording a certified copy of the order removing the lien under Section 53.160 and a certificate from the clerk of the court that states that no bond or deposit as described by Section 53.161 was filed by the claimant within 30 days after the date the order was entered.

Added by Acts 1989, 71st Leg., ch. 1138, Sec. 23, eff. Sept. 1, 1989. Amended by Acts 1997, 75th Leg., ch. 526, Sec. 15, eff. Sept. 1, 1997.

Sec. 53.158. PERIOD FOR BRINGING SUIT TO FORECLOSE LIEN. (a) Except as provided by Subsection (b), suit must be brought to foreclose the lien within two years after the last day a claimant may file the lien affidavit under Section 53.052 or within one year after completion, termination, or abandonment of the work under the original contract under which the lien is claimed, whichever is later.

(b) For a claim arising from a residential construction project, suit must be brought to foreclose the lien within one year after the last day a claimant may file a lien affidavit under Section 53.052 or within one year after completion, termination, or abandonment of the work under the original contract under which the lien is claimed, whichever is later.

Added by Acts 1989, 71st Leg., ch. 1138, Sec. 23, eff. Sept. 1, 1989. Amended by Acts 1997, 75th Leg., ch. 526, Sec. 16, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 889, Sec. 4, eff. Sept. 1, 1999.

Sec. 53.159. OBLIGATION TO FURNISH INFORMATION. (a) An owner, on written request, shall furnish the following information within a reasonable time, but not later than the 10th day after the date the request is received, to any person furnishing labor or materials for the project:

(1) a description of the real property being improved legally sufficient to identify it;

(d)  Not later than the 30th day after the date a written request is received from the owner, the contractor under whom a claim of lien or under whom a bond is made, or a surety on a bond on which a claim is made, a claimant for a lien or under a bond shall furnish to the requesting person a copy of any applicable written agreement, purchase order, or contract and any billing, statement, or payment request of the claimant reflecting the amount claimed and the work performed by the claimant for which the claim is made.  If requested, the claimant shall provide the estimated amount due for each calendar month in which the claimant has performed labor or furnished materials.

(e)  If a person from whom information is requested does not have a direct contractual relationship on the project with the person requesting the information, the person from whom information is requested, other than a claimant requested to furnish information under Subsection (d), may require payment of the actual costs, not to exceed $25, in furnishing the requested information.

(f)  A person, other than a claimant requested to furnish information under Subsection (d), who fails to furnish information as required by this section is liable to the requesting person for that person's reasonable and necessary costs incurred in procuring the requested information.

(g)  Expired.

Added by Acts 1989, 71st Leg., ch. 1138, Sec. 23, eff. Sept. 1, 1989. Amended by:

Acts 2011, 82nd Leg., R.S., Ch. 499 (H.B. 1390), Sec. 7, eff. September 1, 2011.


Sec. 53.160.  SUMMARY MOTION TO REMOVE INVALID OR UNENFORCEABLE LIEN.  (a)  In a suit brought to foreclose a lien or to declare a claim or lien invalid or unenforceable, a party objecting to the validity or enforceability of the claim or lien may file a motion to remove the claim or lien.  The motion must be verified and state the legal and factual basis for objecting to the validity or enforceability of the claim or lien.  The motion may be accompanied by supporting affidavits.

(b)   The grounds for objecting to the validity or enforceability of the claim or lien for purposes of the motion are limited to the following:

(1)   notice of claim was not furnished to the owner or original contractor as required by Section 53.056, 53.057, 53.058, 53.252, or 53.253;

(2)   an affidavit claiming a lien failed to comply with Section 53.054 or was not filed as required by Section 53.052;

(3)   notice of the filed affidavit was not furnished to the owner or original contractor as required by Section 53.055;

(4)   the deadlines for perfecting a lien claim for retainage under this chapter have expired and the owner complied with the requirements of Section 53.101 and paid the retainage and all other funds owed to the original contractor before:

(A)   the claimant perfected the lien claim; and

(B)   the owner received a notice of the claim as required by this chapter;

(5)   all funds subject to the notice of a claim to the owner and a notice regarding the retainage have been deposited in the registry of the court and the owner has no additional liability to the claimant;

(6)   when the lien affidavit was filed on homestead property:

(A)   no contract was executed or filed as required by Section 53.254;

(B)   the affidavit claiming a lien failed to contain the notice as required by Section 53.254; or

(C)   the notice of the claim failed to include the statement required by Section 53.254; and

(7)   the claimant executed a valid and enforceable waiver or release of the claim or lien claimed in the affidavit.

(c)   The claimant is not required to file a response.  The claimant and any other party that has appeared in the proceeding must be notified by at least 21 days before the date of the hearing on the motion.  A motion may not be heard before the 21st day after the date the claimant answers or appears in the proceeding.

(d)   At the hearing on the motion, the burden is on:

(1)   the claimant to prove that the notice of claim and affidavit of lien were furnished to the owner and original contractor as required by this chapter;   and

(2)   the movant to establish that the lien should be removed for any other ground authorized by this section.

(e)   The court shall promptly determine a motion to remove a claim or lien under this section.   If the court determines that the movant is not entitled to remove the lien, the court shall enter an order denying the motion.   If the court determines that the movant is entitled to remove the lien, the court shall enter an order removing the lien claimed in the lien affidavit.   A party to the proceeding, may not file an interlocutory appeal from the court's order.

(f)   Any admissible evidence offered at the hearing may be admitted in the trial of the case.   The court's order under Subsection (e) is not admissible as evidence in determining the validity and enforceability of the claim or lien.

Added by Acts 1997, 75th Leg., ch. 526, Sec. 17, eff. Sept. 1, 1997. Amended by:

Acts 2011, 82nd Leg., R.S., Ch. 499 (H.B. 1390), Sec. 8, eff. September 1, 2011.


Sec. 53.161.   BOND REQUIREMENTS AFTER ORDER TO REMOVE.   (a)   In the order removing a lien, the court shall set the amount of security that the claimant may provide in order to stay the removal of the claim or lien.   The sum must be an amount that the court determines is a reasonable estimate of the costs and attorney's fees the movant is likely to incur in the proceeding to determine the validity or enforceability of the lien.   The sum may not exceed the amount of the lien claim.

(b)   The court shall stay the order removing the lien if the claimant files a bond or a deposit in lieu of a bond in the amount set in the order with the clerk of the court not later than the 30th day after the date the order is entered by the court unless, for good cause, the court orders a later date for filing the bond or the deposit in lieu of a bond.   If the court fails to set the amount of the security required, the amount required is the amount of the lien claim.